SAFORO & ASSOCIATES, INC., Geo Specialty Chemicals, Inc., and William Evans *v*. POROCEL CORPORATION

98-1193 991 S.W.2d 117

Supreme Court of Arkansas
Opinion delivered May 27, 1999
[Petition for rehearing denied July 1, 1999.]

*Friday, Eldredge & Clark*, by: *Kevin A. Crass*, for appellants.

*Rose Law Firm*, by: *Richard T. Donovan*, for appellee.

W H. "DUB" ARNOLD, Chief Justice. This is a case involving the toll processing (*i.e.*, processing for a fee) by appellee of raw material owned by appellant Saforo & Associates and alleged misappropriations by Saforo, as well as appellee's former plant manager, appellant Williams Evans, and appellant GEO Specialty Chemicals, Inc., of trade secrets regarding the wash water system designed for that toll processing, in this case the washing step, of a raw material referred to as "Bayer Scale," which is an alumina residue that has been used for various applications in the past and is currently being used in the refrigerate core industry, as well as other applications.

Appellant Saforo had originally entered into an arrangement with appellee Porocel whereby appellee would perform the washing step of the Bayer Scale. At the time the wash water system ultimately used by appellee was constructed, appellant William Evans supervised the construction and operation of the wash system at Porocel. Within a short time, the business relationship between appellee and Saforo deteriorated, and Saforo began looking for an alternative processor of his Bayer Scale. Ultimately, appellant GEO Specialty Chemicals was contracted by Saforo to process the Bayer Scale.

Appellee brought an action in Pulaski County Chancery Court seeking to enjoin the appellants from processing the Bayer Scale at the GEO facility in Little Rock utilizing the specific wash water system which had been utilized at Porocel. Appellee also sought damages for the misappropriation of a trade secret, as well

as contract damages from Saforo & Associates for failure to pay for the processing completed by appellee.

On March 31, 1997, the trial court conducted a hearing on appellee's motion for temporary injunction and found, in an order dated April 10, 1997, that the appellants had misappropriated appellee's trade secret; the court issued an injunction. The trade secret at issue is limited to the wash step of the processing of the Bayer Scale. The wash step consisted of a tank and a separate component referred to by the parties as a Sweco screen. Appellants contended that the wash water system was not unique and had been utilized in processing of aluminum products throughout the industry for a long period of time.

On March 13 and March 17, 1998, the trial court conducted a trial to determine the following: whether appellee should be granted a permanent injunction; whether appellee was entitled to damages for the misappropriation of the trade secret; and, whether appellee was entitled to damages from Saforo & Associates, Inc., for breach of contract. In an order dated April 1, 1998, the court reaffirmed its earlier finding that the appellants had misappropriated appellee's trade secret. The court further found that appellee had been damaged in the amount of $88,092.73 by the misappropriation of the trade secret and awarded appellee $63,500.00 against Saforo & Associates, Inc., on a theory of an implied contract. Additionally, the court found that the misappropriation was willful and malicious and awarded appellee attorney's fees in the amount of $15,000.00, but declined to award prejudgment interest.

Appellants appeal from the court's order and judgment and assert the four following points as the basis for their appeal:

1) The trial court erred in finding that the appellee's wash water system constituted a trade secret under Ark. Code Ann. § 4-75-601;

2) The trial court erred in finding that the appellants willfully misappropriated a trade secret;

3) The trial court erred in the determination of appellee's damages sustained as a result of the misappropriation of trade secrets;

4) The trial court erred in its determination of damages owed by appellant Saforo & Associates, Inc., for breach of an implied contract.

We agree with appellant that the trial court erred in its determination of appellee's damages sustained as a result of the misappropriation of the trade secret, but affirm the trial court on each of the other points asserted by appellants.

I. *Whether appellee's wash water system constituted a trade secret.*

It is well settled that chancery cases are reviewed *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Slaton v. Slaton*, 336 Ark. 211, 983 S.W.2d 951 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*; *RAD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986).

Ark. Code Ann. § 4-75-601 *et seq.* (Repl. 1996) is the Arkansas Trade Secrets Act and is based upon the Uniform Trade Secrets Act. It defines a trade secret as "a . . . process . . . that: [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ark. Code Ann. § 4-75-601(4). (Subsection divisions omitted.)

When applying the six factors articulated in *Vigoro Industries, Inc. v. Cleveland Chemical Co. of Arkansas, Inc.*, 866 F.Supp. 1150 (E.D. Ark. 1994), to the evidence in this case, as the trial court correctly did, it is clear that Porocel's wash water system constituted a trade secret. We hereby adopt the *Vigoro* factors as the controlling analysis for determining whether any particular information constitutes a trade secret.

The first factor is the extent to which the information is known outside the business. It was uncontested that the Bayer Scale industry is very limited, given that Reynolds Metal is the

only producer of Bayer Scale and purchasers of same are few. Saforo has the exclusive right to that Bayer Scale. The evidence showed that only three companies have ever processed Bayer Scale — Porocel, GEO, and Alcoa. Several industry experts testified that in all their years of experience in the aluminum/bauxite industry, they had never seen a wash water system like the Porocel wash water system.

Appellants contend that the Porocel wash water system is within the public domain. However, the evidence adduced at trial indicated that the Porocel wash water system was a unique solution to the needs of one customer in the industry. It is a combination of components, each of which by itself is in the public domain, but the unified process has afforded a competitive advantage. The competitive advantage was evidenced by the fact that appellant GEO hired appellant Evans to set up the Porocel wash water system at GEO. It is telling that with all the engineering expertise available at GEO, it nevertheless hired Evans, a former Porocel employee, to oversee the installation of the wash water system at GEO, which was almost identical to the unique Porocel wash water system.

The second factor is the extent to which the information is known by employees and others involved in the business. The trial court found, and its finding remains unrebutted, that the specific washing system involved was not generally known by either appellee's or appellants' employees. The court further found that there was no testimony that the information was known to others outside the business.

The third factor is the extent of measures taken by appellee to guard the secrecy of the information. The evidence showed that Saforo had entered into a confidentiality agreement with AluChem, which eventually purchased Porocel, and that Evans had entered into one with Porocel, through Englehard Corporation — Porocel being a wholly owned subsidiary of Englehard. Further, while Porocel did not have a confidentiality agreement with Saforo, the evidence is clear that Porocel took sufficient measures to guard the configuration of the washing system since it was only revealed to Evans, who was under a duty to

maintain its secrecy under his confidentiality agreement with Porocel through Englehard, regardless of whether he had signed a confidentiality agreement with AluChem. In an attempt to prove that Porocel's measures to guard the secrecy of the configuration were inadequate, it was argued by appellants that Ron Bell's sketch design of the Porocel wash water system had been shown to Saforo; however, when questioned regarding the subject, Mr. Saforo testified that he had never before seen the sketch.

Mike Sharp of Porocel described the measures taken by Porocel to maintain the secrecy of its wash water system:

1) Secrecy agreement between Saforo and AluChem;

2) Secrecy agreement between AluChem and Englehard;

3) Secrecy agreements signed by all Porocel employees when Englehard owned Porocel;

4) Secrecy agreements signed by all Porocel employees after acquisition by the AluChem owners; and

5) Secrecy agreements as a condition of employment for all new Porocel hires.

The Arkansas Trade Secrets Act requires *reasonable* measures to maintain secrecy. We hold that appellee employed reasonable measures to guard the configuration of the washing system.

■ The fourth factor is the value of the information to appellee and to its competitors. The apparent value of the Porocel wash water system was its efficiency and inexpensive installation. The testimony revealed that the cost of installing Porocel's system was approximately $17,000.00, whereas, an alternative system of vacuum filtration would have cost approximately $200,000.00 to install. Even William Evans admitted that he saved GEO thousands of dollars and weeks of installation time by installing Porocel's wash water system at GEO. Obviously, the information of Porocel's system was valuable to Porocel and to its competitors.

■ The fifth factor is the amount of effort or money expended by appellee in developing the information. The record indicated that Ron Bell, the chemical engineer employed by Porocel's eventual owner, AluChem, spent weeks considering the

solution to the engineering problem presented by the washing step in the processing of Saforo's Bayer Scale. Although there was testimony that Mr. Bell sketched the system in a relatively short period of time, it was obviously his intellectual effort that gave Porocel a competitive advantage, since the other experts who testified said they had never before seen a wash water system such as the one designed by Bell.

The sixth and final factor is the ease or difficulty with which the information could be properly acquired or duplicated by others. The trial court found:

> [Appellants] rely on the testimony of Mr. Saforo and Dr. Albers [the Baltimore "batch" washer] to assert that the Porocel system is not unique. However, the [c]ourt does not find their testimony in this regard as credible. Therefore, the [c]ourt finds that while the component parts of the system are in the public domain, the system's configuration is not.

We have held many times that this Court will defer to the trial court's evaluation of the credibility of the witnesses. Ark. R. Civ. P. 52(a); *Crawford v. Dep't. of Human Services*, 330 Ark. 152, 951 S.W.2d 310 (1997). Further, no evidence was introduced at the final hearing to change this finding. No witness testified that he had ever seen Bayer Scale washed in the fashion of Porocel's wash water system.

As stated in *L. M. Rabinowitz & Co., Inc. v. Dasher*, 82 N.Y.S.2d 431 (1948), cited by appellee, "[I]t is easy for the [appellants'] experts to point to various parts of [appellee's] machines which may now be in the public domain and having seen and examined the [appellee's] machines, to state that they could have been constructed by a skilled mechanic who knew the 'prior art.'" Still, the fact remains that no one except Porocel came up with the design at issue; further, GEO hired a former Porocel employee with confidentiality obligations to duplicate the system at GEO.

In sum, we hold that substantial and credible evidence exists to support the trial court's finding that the appellee's wash water system constitutes a trade secret. Applying our holding in the case of *Allen v. Johar, Inc.*, 308 Ark. 45, 823 S.W.2d 824

(1992), to the present case helps clarify the issue. In *Allen*, we held that where tours of the building were not allowed and evidence showed that it was a very competitive business because there were a limited number of companies involved, the appellate court could not say that the chancellor was clearly erroneous in finding that Johar's production machines were protected under the Arkansas Trade Secret Law. When applying the *Allen* holding to the facts present in the case at bar, it is clear that Porocel's system was also protected under the Arkansas Trade Secret Law. Therefore, we affirm the trial court on this point.

## II. Whether appellants willfully misappropriated the trade secret.

The trial court held Porocel was entitled to an attorney's fee of $15,000.00 under Ark. Code Ann. § 4-75-607 (Repl. 1996) because appellants willfully misappropriated Porocel's trade secret. The trial court held that Porocel should bear some of its own fee due to the "lax manner of handling its affairs." This referred to Porocel's contract claim for unpaid processing fees and the lack of a definitive agreement on price.

We agree with the trial court and hold that from the record, it is clear that substantial and credible evidence exists to support the trial court's finding of willful misappropriation. First, appellant Evans was Porocel's former plant manager who implemented the Porocel wash water system, and although he had signed a confidentiality agreement which obligated him to maintain secrecy of the Porocel wash water system after his employment with Porocel was terminated, he nonetheless became Saforo's "consultant" to help Saforo find a new processor, without alerting Porocel.

Appellants GEO and Saforo knew that Evans was implementing the Porocel wash water system at GEO. They claim that they did not believe Porocel's system was a trade secret. However, GEO required that Saforo indemnify it for any liability it may incur for theft of trade secrets in the processing of Saforo's Bayer Scale. The existence of the indemnity agreement is a clear indication that appellants at least contemplated the existence of a trade secret and the possible misappropriation thereof.

██ In sum, the evidence is overwhelming that Evans was specifically hired by Saforo to implement the Porocel wash water system at GEO because Evans knew all about the system and GEO would charge Saforo less for the toll processing, thereby benefitting each of the appellants in one way or another. Each appellant was a willing participant because each had something to gain from the misappropriation of Porocel's trade secret. Therefore, we affirm the trial court on this point, as well.

### III. Appellee's damages sustained as a result of the misappropriation of the trade secret.

Appellants' third argument challenges the award of damages to Porocel for the misappropriation of its trade secret. While noting that there is no Arkansas law on the appropriate calculation of such damages, appellants contend that the award is in error because the trial judge erroneously commingled damage theories based on plaintiff's lost profits and defendant's gain.

Appellants had submitted to the trial court a measure that would be based on the calculation of the profits earned by a defendant as a result of the misappropriation. They argue here that the trial court should have based the award on their profits, and that such a calculation is preferred in a majority of jurisdictions who have entertained the question. Appellants claim that calculating damages based upon the defendant's actual profits is the most reasonable method available and serves the purpose of preventing unjust enrichment. Appellee recognizes that the trial judge did not follow either party's theory to calculate damages, yet contends that the method used by the trial court was not clearly erroneous. Still, appellee points to authority which holds that a plaintiff's lost profits is an appropriate measure of damages in a trade-secret-misappropriation case. *See, i.e., Sperry Rand Corporation v. A-T-O, Inc.,* 447 F.2d 1387 (4th Cir. 1971). Appellee asserts that it would be denied a full recovery if damages for misappropriation of a trade secret were to be calculated simply on a defendant's profit-margin basis.

██ The resolution of this issue is one of first impression and requires the application of this Court's rules on statutory con-

struction to Ark. Code Ann. § 4-75-606 (Repl. 1996), which states as follows:

> (a) In addition to or in lieu of injunctive relief, a complainant may recover damages for the actual loss caused by misappropriation.

> (b) A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

Recently, we set out rules of statutory interpretation in the case of *State v. R & A Investment Co.*, 336 Ark. 289, 985 S.W.2d 299 (1999). In *R & A Investment Company*, we explained that the basic rule of statutory construction, to which all other interpretive guides must yield, is to give effect to the intent of the legislature. When a statute is clear, it is given its plain meaning, and we will not search for legislative intent; rather, that intent must be gathered from the plain meaning of the language used. *Id.* We further stated that we are hesitant to interpret a legislative act in a manner contrary to its express language unless it is clear that a drafting error or omission has circumvented legislative intent. In interpreting a statute and attempting to construe legislative intent, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that throw light on the subject. *Id.*

From the plain language of the statute, it is apparent that the General Assembly has provided for recovery of a complainant's "actual loss." It is further clear that a complainant may also recover any unjust enrichment of the defendant caused by the misappropriation. The problem with this provision is that there is no guidance as to what the General Assembly meant by "actual loss." "Actual loss" could mean the complainant's lost profits, as appellee suggests, or the term could be construed to mean a defendant's profits, since the complainant may also recover for unjust enrichment of the defendant that is "not taken into account in computing damages for actual loss." Therefore, we hold that the language of § 4-75-606 is ambiguous, and that guidance from other sources is necessary.

One compelling source on the subject is the American Law Reports Annotation of the proper measure and elements of damages for misappropriation of trade secrets. *See*, Michael A. Rosenhouse, *Damages — Misappropriation of Trade Secret*, 11 A.L.R. 4th 12. The annotation collects and discusses state and federal cases in which courts from other jurisdictions have considered the measure and elements of recovery for misappropriation of a trade secret. 11 A.L.R. 4th at 19. Rosenhouse writes that in determining the proper measure of damages in a misappropriation case, the first inquiry of the courts generally has been whether there is any factual basis, such as a royalty agreement or an offer and a counteroffer in anticipation thereof, from which one might legitimately determine the value which the parties themselves actually assigned to the misappropriated information. If there is such an agreement, the court should then look to its terms in setting the complainant's damages. 11 A.L.R. 4th at 20.

On the other hand, where there is a lack of such proof indicating what the parties thought the trade secret was worth, courts are then guided by what the plaintiff has proved — whether that be the plaintiff's lost profits or an accounting for the defendant's profits. According to Rosenhouse, both measures have been deemed acceptable in general, and some jurisdictions hold that a complainant may recover either his own lost profits or the defendant's profits, whichever affords the greater recovery. With this we agree.

Regardless of which calculation affords the greater recovery to appellee in this case, it is clear that the trial court erred in its calculation because it based the measure of damages on a hybrid calculation not contemplated by the language of § 4-75-606. Even the appellee admits that the trial court used both its estimated price per ton for processing the Bayer Scale, as well as GEO's number of tons of scale it actually processed from December 10, 1996, to the date of the temporary injunction on March 31, 1997, to arrive at the damage award.

While it is difficult to fault the trial court, based on the lack of Arkansas authority in this area as well as the ambiguous

controlling statute, there is ample guidance from other jurisdictions that the damages are to be calculated by either the plaintiff's lost profits or the defendant's gain, but not a combination of the two. For this reason, we hold that the trial court's damage award for misappropriation of the trade secret was in error, and reverse and remand the case on this point with instruction to the trial court to modify the award according to the rule adopted by this Court that a complainant may recover either his own lost profits or the defendant's profits, whichever affords the greater recovery.

*IV. Damages owed by appellant Saforo & Associates, Inc., for breach of an implied contract.*

Count II of Porocel's original complaint was a breach-of-contract claim solely against Saforo. Porocel sought damages based upon a claim that there was an express contract whereby Saforo agreed to pay a processing fee of $490 per ton. The trial court found that there was no express contract but acknowledged that Porocel was entitled to recover its costs under an implied contract and that the proof indicated the variable costs incurred by Porocel to be approximately $241 per ton for processing the Bayer Scale. The court found "Porocel is entitled to $250 per ton for the 254 tons. Porocel is entitled to recover of and from Saforo the sum of $63,500."

Appellant Saforo contends that while the trial court was correct in its finding that Porocel was limited to recovery under an implied contract and that the costs were $241 per ton, it clearly erred in its conclusion that Porocel was entitled to $63,500. Appellant Saforo & Associates asserts that it should be given credit for payments totaling $80,092.91, which would leave an amount of only $12,022.92 owing to Porocel.

Again, chancery cases are reviewed *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Slaton v. Slaton, supra.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm

conviction that a mistake has been committed. *Id.; RAD-Razor-back Ltd. Partnership v. B.G. Coney Co., supra.*

Appellant Saforo fails to make a compelling argument to support its contention. Appellant Saforo references several invoice numbers and exhibits to purportedly demonstrate that when the proper tonnage is applied to the court's determination of a fair price of $250 per ton, it would only owe $12,022.92. However, appellant Saforo's argument, when compared to the exhibit showing its payment history with attached checks, fails to prove that it was entitled to an $80,092.91 credit. Therefore, when applying our standard of review to appellant Saforo's assertion, we cannot say that the trial court erred. We, therefore, affirm the trial court on this point.

For all of the foregoing reasons, we hereby affirm the trial court on points one, two, and four above, but reverse and remand the case on point three, that being the measure of damages regarding the misappropriation of a trade secret, with instruction to the trial court to modify the award according to the rule adopted by this Court that a complainant may recover either his own lost profits or the defendant's profits, whichever affords the greater recovery.

Affirmed in part; reversed and remanded in part.

THORNTON and SMITH, JJ., dissent.

R AY THORNTON, Justice, dissenting. I respectfully dissent from the majority in this case on the grounds that appellees failed to satisfy the requirements of the factors articulated in *Vigoro Industries, Inc. v. Cleveland Chemical Co. of Arkansas, Inc.,* 866 F. Supp. 1150 (E.D. Ark. 1994), and I would hold that the trial court's finding that appellee's wash water system constituted a trade secret under Ark. Code Ann. § 4-75-601 was clearly erroneous.

The trial court and the majority rely upon secrecy agreements between Saforo and AluChem, between AluChem and Englehard, and confidentiality agreements signed by Porocel

employees with first Englehard and later AluChem. However, the wash-water system was designed by Mr. Ron Bell, a chemical engineer who was a part owner of AluChem. As stated by counsel for appellee, Mr. Bell was the owner of whatever trade secrets were incorporated in his design. At the time he completed the wash-water design and sent it to Bill Evans, an employee of Porocel, in February of 1996, Mr. Bell had not consummated any relationship with Mr. Evans or with Porocel. The requirement of maintaining the secrecy of a trade secret was discussed in *Ruckelshaus v. Monsanto*, 467 U.S. 986 (1983), when the Supreme Court stated: "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Id.*

At the time of the disclosure, there was only the anticipation of the relationship between AluChem and Porocel. That relationship did not develop until May 7, 1997, several months after the design was disclosed, and during which interval Porocel built the machine and produced Bayer Scale using the design. There is no evidence to support a finding that a confidentiality agreement existed between Mr. Bell and Porocel in February. The majority is willing to bootstrap a later purchase of the corporate entity to create a confidential relationship that simply did not exist at the time the disclosure was made. The only support for the majority's leap of faith was Mr. Bell's testimony that he believed there was a confidentiality agreement in place and that, while he never designated his sketch as "confidential," he intended it to be proprietary. In my view, this subjective test of what Mr. Bell believed is insufficient to convey trade-secrecy protection upon the wash-water system, in light of Arkansas law which requires that those who claim the protection must take reasonable measures to maintain their secrecy.

In oral arguments, counsel for Porocel conceded that Mr. Bell was the original owner of the trade secret, and that he had given away his trade secret in the hope that he could sometime later acquire Porocel. Counsel further agreed that if the acquisi-

tion did not go through, Bell would have lost any protection for the wash-water system as a trade secret. Once the trade secret was destroyed by disclosure, it entered the public domain. Even if it had been a unique solution to the needs of one customer, it was not modified or redesigned by Porocel. There is no showing that Porocel added any concepts to the design. No new trade secret came into existence, but only Mr. Bell's design, which had already entered the public domain, was utilized by Porocel. No argument was made by Porocel that after a trade secret is destroyed by disclosure, it can be brought back into existence by purchasing the company to which it was disclosed. Mr. Bell did not take appropriate measures to protect his trade secret, and when it was disclosed, it ceased to be a trade secret. "With respect to a trade secret, the right to exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data." *Ruckelshaus, supra.*

This clearly does not meet the *Vigoro* test of making reasonable efforts to maintain its secrecy. As a matter of interest, during the time after Mr. Bell's trade secret had been terminated by its disclosure to Porocel, and before Mr. Bell's purchase of Porocel, Porocel built the wash-water machine, installed it, and commenced selling the product to Saforo. It was not until May 7, 1997 that Bell consummated the purchase of the facilities under the name of Porocel, and, as appellees conceded at oral arguments, if that purchase had not been completed, Bell would have lost any claim of a trade secret. I dissent because, as I read the law, there were no appropriate measures taken to guard the secrecy of the wash-water system; therefore, appellees should be denied the protection of the trade-secrecy laws.

I am authorized to state that Justice SMITH joins in this dissent.