HRR ARKANSAS, INC., and Paul Davis Systems of Central Ark. *v.* RIVER CITY CONTRACTORS, INC., Tom Megee, and Donna Wright

01-598 87 S.W.3d 232

Supreme Court of Arkansas
Opinion delivered October 24, 2002

*Brown, Schwander, Greene & Sloan, P.L.C.*, by: *L. Howard Schwander, III*, for appellant HRR Arkansas, Inc.

*Ross & Ross, P.A.*, by: *Mark L. Ross*, for appellees.

JIM HANNAH, Justice. HRR Arkansas, Inc., d/b/a Paul Davis Systems of Arkansas ("HRR"), appeals the final

order and judgment of the Pulaski County Chancery Court, Fourth Division. HRR alleges that the trial court erred: (1) by failing to dismiss the claim of Appellee River City Contractors, Inc. ("River City"), when River City lacked the capacity to sue as a corporation; (2) by failing to remit to HRR $4,000 paid to Appellee Donna Wright; (3) by refusing to grant a permanent injunction to enforce the covenants not to compete provisions of Appellee Tom Megee's "Sale of Assets Agreement" and "Associate Employment Agreement"; and (4) by awarding commissions to Megee that were contrary to the express language of the Sale of Assets Agreement and Associate Employment Agreement. We reverse and dismiss the trial court's judgment in favor of River City. We affirm the trial court on the remaining points on appeal.

The Arkansas Court of Appeals certified the instant appeal to this court as an issue of significant public interest or a legal principle of major importance. Thus, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(d)(2).

*Facts*

HRR is an Arkansas corporation solely owned by Eric Tucker. In 1996, HRR entered into a Sale of Assets Agreement with Megee, on behalf of River City. Megee was the sole shareholder of River City. Both HRR and River City were in the business of restoration and home repair to damaged property caused by casualty and peril, as defined in the casualty insurance business. River City was a long-established business in the central Arkansas area, and HRR had no Arkansas presence at the time of its purchase of River City's assets. HRR purchased River City to acquire an existing restoration business which had established good working relationships with insurance companies, their agents and adjusters.

The Sale of Assets Agreement was conditioned upon a commercial lease with River City, as well as the execution of an Associate Employment Agreement with Megee. Both the Sale of Assets Agreement and the Associate Employment Agreement contained covenants not to compete, which provided that "for a period of five (5) years from the date of this agreement, or two (2)

years after the termination of this agreement, which ever occurs later, directly or indirectly, within a radius of ten (10) miles of 2824 Barrow Road, Little Rock, Arkansas, or such others established by [HRR]," Megee was not to "engage in the business of insurance restoration or other business substantially the same . . .".

The terms relating to the sales price in the Sale of Assets Agreement indicated that HRR would pay over a period of time. In addition, the sales price could change by downward adjustments if there were shortfalls in Megee's revenue production while employed by HRR. Under the terms of the agreement, HRR would receive 20% of all customer contract prices before any commissions were owed to Megee.

After twenty-five months, the working relationship between HRR and Megee broke down. Megee was dissatisfied with the way HRR was running River City. HRR alleged that Megee made derogatory remarks, accusing Tucker of being racist and being prejudiced. HRR also alleged that Megee made "innuendos" about HRR's financial status. Megee and River City complained of unpaid commissions and past due rent. Megee's attorney sent a letter to HRR which outlined his disagreements with HRR. Immediately thereafter, HRR changed the locks on the place of business.

Appellee Wright executed a Sale of Assets Agreement with HRR, in which HRR purchased Wright's "book of business" for $4,000. The book of business included the contacts listed in Exhibit A, which was to be attached to the Sale of Assets Agreement. Wright also entered into an Associate Employment Agreement with HRR. The Sale of Assets Agreement and the Associate Employment Agreement contained covenants not to compete. The covenant not to compete in Wright's employment contract provided that, for two (2) years after termination of employment, Wright was not to "solicit or do business with any adjuster or insurance company for which [HRR] had completed estimates within the past two (2) years . . .".

Megee and Wright were fired at approximately the same time. Thereafter, Megee began operating a home repair and res-

toration business, under the banner of River City Contractors, Inc., in North Little Rock. Wright went to work for Megee.

HRR filed a petition for injunctive relief and damages for breach of the Sale of Assets Agreement against Megee and Wright, arguing that Megee and Wright were in direct competition with HRR, in violation of the no-compete clauses contained in the Associate Employment Agreements and Sale of Assets Agreements. River City counterclaimed and asserted damages for unpaid rent. Megee counterclaimed and asserted damages for unpaid commissions under the Sale of Assets Agreement and Associate Employment Agreement. Wright counterclaimed and asserted damages for unpaid salary and benefits under the Associate Employment Agreement.

HRR, River City, Megee, and Wright submitted a joint exhibit reflecting customer contract prices and amounts actually collected. The trial court appointed a special master to perform an accounting of HRR's books and bank accounts.

At the close of trial, HRR moved to dismiss all claims by River City, asserting that River City lacked capacity to bring suit. HRR offered into evidence a certified copy of a proclamation from the Secretary of State, which stated that River City's charter had been revoked in 1996 due to River City's failure to pay franchise taxes. River City offered no evidence regarding reinstatement of its corporate charter. The trial court did not rule on the motion at that time, but stated that it would issue a letter opinion.

The trial court issued a letter opinion with the following findings. The court determined that the Sale of Assets Agreement with Wright was not a sale, but a non-compete agreement. The court declined to enforce the agreement, finding that $4000 was insufficient consideration for a non-compete agreement. The trial court did not order Wright to return the $4000 she received under the Sale of Assets Agreement. In addition, the court declined to enforce the non-compete clause of Wright's Associate Employment Agreement because Wright had not learned any trade secrets, because the non-compete clause contained no geo-

graphical location, and because Wright was terminated for reasons other than poor job performance.

The trial court declined to enforce the non-compete clause in the Sale of Assets Agreement with Megee, finding that the agreement was predicated on future job performance and was not a sale of assets. Further, the trial court found that the consideration of $26,000 paid to Megee was insufficient and unreasonable for a five-year promise not to compete. The trial court ordered Megee to return the $26,000 paid to him by HRR. The court did not enforce the non-compete clause in Megee's Associate Employment Agreement because HRR terminated Megee without just cause. In addition, the court determined that the non-compete clause was unenforceable because the geographical area was uncertain.

In an order filed October 26, 2000, the trial court awarded Megee commissions in the amount of $9,523.65. The trial court awarded River City $25,920 for unpaid rent, less roof repairs, that HRR owed to River City. The court ordered Megee to return the $26,000 paid to him by HRR. Wright was awarded $1,224.87 for three weeks' pay and two days' car allowance.

### Standard of Review

Our standard of review in chancery cases is *de novo*. *ConAgra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000) (*Tyson I*); *Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979). In *Tyson I*, we stated:

> All of the issues raised in the court below are before the appellate court for decision and trial de novo on appeal in equity cases involves determination of fact questions as well as legal issues. The appellate court reviews both law and fact and, acting as judges of both law and fact as if no decision had been made in the trial court, sifts the evidence to determine what the finding of the chancellor should have been and renders a decree upon the record made in the trial court. The appellate court may always enter such judgment as the chancery court should have entered upon the undisputed facts in the record.

*Tyson I, supra* (quoting *Ferguson, supra* (citations omitted)). We have further noted that we do not reverse a finding of fact of the chancery court unless we conclude that the chancery court has clearly erred. *Weigh Systems South, Inc. v. Mark's Scales & Equipment, Inc.*, 347 Ark. 868, 68 S.W.3d 299 (2002); *Saforo & Assoc., Inc. v. Parocel Corp.*, 337 Ark. 553, 991 S.W.2d 117 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Bendinger v. Marshalltown Trowel Co.*, 338 Ark. 410, 994 S.W.2d 468 (1999); *Saforo, supra.*

## Lack of Capacity to Sue

■ ■ There is a near universal rule that a corporation and its stockholders are separate and distinct entities, even though a shareholder may own the majority of the stock. *First Commercial Bank, N.A., v. Walker*, 333 Ark. 100, 969 S.W.2d 146, *cert. denied*, 525 U.S. 965 (1998); *Banks v. Jones*, 239 Ark. 396, 390 S.W.2d 108 (1965). A corporation has the power to sue and be sued in its corporate name. Ark. Code Ann. § 4-26-204(a)(2) (Repl. 2001). Generally, a corporate officer has no individual right of action against a third party for alleged wrongs inflicted on the corporation, even if the officer is the sole shareholder. *Walker, supra.*

■ In considering whether a corporation that had ceased to exist could initiate a lawsuit, we have stated:

> [T]he trial judge ruled, quite properly, that a corporation not in existence could not initiate a lawsuit. That is the law. In *Sulphur Springs Recreational Park, Inc. v. City of Camden*, 247 Ark. 713, 447 S.W.2d 844 (1969), we affirmed a trial court's dismissal of a complaint, because the plaintiff's corporate charter was not in existence when the suit was filed . . . . A suit must be initiated by a person, natural or artificial. *Fausett & Co. v. Bogard*, 285 Ark. 124, 685 S.W.2d 153 (1985).

*Committee for Utility Trimming, Inc. v. Hamilton*, 290 Ark. 283, 718 S.W.2d 933 (1986). Our law provides that a corporation cannot file a complaint in court after it ceases to exist legally. *Id.*

█ River City's corporate charter was revoked by the Secretary of State in 1996, pursuant to Ark. Code Ann. § 26-54-111 (Repl. 1997), after River City failed to pay franchise taxes. There is nothing in the record to indicate that River City has ever attempted to reinstate its corporate charter. River City ceased to exist legally; therefore, it cannot initiate a lawsuit. River City lacked the capacity to sue, and it follows that River City lacked the capacity to obtain a judgment. The trial court erred when it awarded River City $25,920 for unpaid rent.

### Sums Paid to Wright

HRR argues that the trial court erred when it failed to order Wright to remit the $4,000 paid to Wright under the Sale of Assets Agreement after the trial court rescinded the Sale of Assets Agreement, holding it unenforceable. It must be noted that the trial court did not rescind the Sale of Assets Agreement, nor did it hold that the agreement was unenforceable. Rather, the trial court held that the covenant not to compete contained in the Sale of Assets Agreement was unenforceable. In its letter opinion, the court noted that HRR had never been able to furnish the court with a complete copy of the contract that it wished to enforce, and that Wright denied that she had a book of business to sell. The trial court also found that Wright did not have anything to sell. Further, Wright testified that she was to be paid a salary of $25,000 by HRR, but that Tucker told her he would pay her $21,000 as a salary and $4,000 as a "buyout." Wright testified that Tucker told her he was paying her in this manner for tax purposes. Tucker, who testified that he had a masters in taxation, disputed this claim, stating that he would not reduce tax costs by treating the $4,000 as a buyout.

██ Wright argues that the trial court considered the $4,000 to be compensation for her employment. Indeed, in the letter opinion, the trial court found that Wright had nothing to sell and noted that Wright's employment agreement contained no provision for compensation. The Sale of Assets Agreement provided that Wright was to be paid $4,000 in twelve equal installments of $333.33 "beginning on 5 September 1997 and continuing on each first Friday of every calendar month until

twelve such payments have been made or until [Wright] is no longer employed with [HRR], whichever comes first." This language supports a finding that the $4,000 payment to Wright was compensation for employment, and not for the sale of assets. HRR testified that Wright was being paid $4,000 for her book of business, something that she allegedly possessed before she began working for HRR. If Wright had quit or been fired before she received her twelve payments, then she would have received less than $4,000; therefore, the value of the book of business was dependent upon Wright's future employment. Though the trial court did not specifically find that the $4,000 payment to Wright was compensation for employment, we find that the payment of $4,000, which was contingent upon Wright's employment, was compensation for employment, and not compensation for a sale of assets. We will affirm the trial court when it has reached the right result, even though it has announced the wrong reason. *Norman v. Norman*, 347 Ark. 682, 66 S.W.3d 635 (2002); *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001). The trial court heard testimony from both Wright and Tucker regarding the disputed $4,000, and it was the trial court's decision not to remit the $4,000 to HRR. The chancellor is recognized as being in a superior position to assess the credibility of witnesses. *Mobley v. Harmon*, 313 Ark. 361, 854 S.W.2d 348 (1993). We do not find that the trial court was clearly erroneous when it declined to have Wright return $4,000 to HRR, and accordingly, we affirm.

## Covenants Not to Compete

The trial court declined to enforce the covenant not to compete in Megee's Sale of Assets Agreement because it found that the consideration for a sale of a book of business which is predicated upon future job performance indicated that the contract was not actually a sale of assets. In addition, the trial court declined to enforce the covenant not to compete because it found $26,000 to be insufficient consideration for a covenant not to compete, and because it found the covenant unreasonable in relationship to the contract. Further, the trial court found that since it was holding the contract unenforceable by its terms and its unreasonableness, the contract was in effect, rescinded, and it ordered Megee to

reimburse Tucker for the consideration paid for the alleged sale of the book of business, or $26,000. The trial court also found that Tucker failed to establish that Megee learned or possessed any trade secrets which Megee physically or mentally removed from the office after being terminated.

The trial court declined to enforce the covenant not to compete in Megee's Associate Employment Agreement because it found that the geographic location in the covenant was not only unclear, but unreasonable. The covenant, which is the same as the covenant that appears in the Sale of Assets Agreement, states that Megee cannot compete "within . . . ten (10) miles of 2824 Barrow Road, Little Rock, Arkansas, or such others established by [HRR] . . . ." The trial court determined that the "such others" language "apparently leaves the corporation in control of designating a prohibited geographic location at some time without any assent of the employee," and that the "ambiguous term fails to establish an enforceable geographic location." In its brief, HRR contends that the language used in the covenant not to compete was necessary given the total circumstances. HRR argues that "[w]ithout such opened [sic] ended language, [HRR] could not protect [itself] in the event that Megee decided to breach by cancelling the lease, or losing it in foreclosure, bankruptcy or some other form of divestiture which would force [HRR] to relocate [its] business."

 Without statutory authorization or some dominant policy justification, a contract in restraint of trade is unreasonable if it is based on a promise to refrain from competition that is not ancillary to a contract for the transfer of goodwill or other property. *Bendinger, supra; Dawson, supra.* However, the law will not protect parties against ordinary competition. *Bendinger, supra; Orkin v. Weaver,* 257 Ark. 926, 521 S.W.2d 69 (1975). We have recognized that covenants not to compete in employment contracts are subject to stricter scrutiny than those connected with a sale of business. *Bendinger, supra.* We have held, in cases involving covenants not to compete in both employment contracts and sales of businesses, that whether a restraint provision is reasonable or unreasonable (and thus valid or invalid) is a matter to be determined under the particular circumstances involved. *McCleod v. Meyer,* 237 Ark. 173, 372 S.W.2d 220 (1963).

In *Bendinger*, we stated that the failure of the covenant to contain a geographic restriction rendered it overbroad. *Bendinger, supra*. However, we noted that not every restrictive covenant that failed to contain a geographic restriction would be considered unreasonable. *Id.; see, e.g., Girard v. Rebsamen Ins. Co.*, 14 Ark. App. 154, 685 S.W.2d 526 (1985). In *Girard*, the court of appeals held that a restrictive covenant, under which an insurance salesman was prohibited from soliciting or accepting insurance business from customers whose accounts he serviced at the time of his termination, was reasonable under the circumstances, even though the covenant contained no geographic restriction. *Girard, supra*. The court of appeals noted that the appellant was free to solicit and accept business from 95% of the overall insurance market, and, in fact, was free to solicit and accept business from 80% of the customers of his former employer's office. *Id.*

This case is factually distinguishable from *Girard*. In the present case, the covenant not to compete in Megee's Associate Employment Agreement prohibited Megee, for two years after termination, from engaging in the business of insurance restoration, home repair, or any other substantially similar business. While the employee in *Girard* was free to solicit 95% of the insurance market, in the present case, the covenant not to compete would prohibit Megee from working in any insurance restoration or home repair business. HRR's failure to include an enforceable geographic restriction, combined with the two-year restriction which prohibited Megee from working in insurance restoration, home repair, or other substantially similar businesses renders it overbroad. We agree with the trial court's finding that the covenants not to compete in both the Sale of Assets Agreement and the Associate Employment Agreement are unreasonable.

### Megee's Commissions

HRR argues that the trial court's findings regarding four accounts were clearly against the evidence. HRR contends that the trial court erred in finding that $2,291 remains to be collected on the Neubauer account. HRR contends that pursuant to section 19(b) of Megee's Associate Employment Agreement, there is a 5% charge for all collections, so the commission should have been reduced by $291. The trial court found that Megee was

terminated before he was given the opportunity to collect the account, and on those accounts where Megee was terminated before collection, the amount to be collected was reduced by 65%. This was based on Megee's testimony that each account had a 35% profit built in. We do not find the trial court's determination clearly erroneous.

HRR argues that the trial court erred when it awarded HRR $540 for the Jernigan account. HRR states that, per the terms of the Associate Employment Agreement, Megee guarantees 20% of the customer contract price to HRR. The court found that the contract price was $4,782. HRR contends that it should have been awarded $932.49. Megee stated that he was advised to stop work on the Jernigan job after the customer had a stroke, so the contract was not completed. The trial court resolved the dispute by determining the contract price to be the amount collected. The trial court further found that the legal expenses necessary to collect the account should be considered as part of the expenses incurred, regardless of how it was characterized on the ledger. We do not find the trial court's determination clearly erroneous.

The trial court found that there was litigation over the quality of work performed on the Hinson account. HRR argues that the contract price was $79,224 on the Hinson account, and that the trial court arbitrarily established the contract price of $45,926. HRR argues that pursuant to their agreement, Megee owed HRR 20% of the contract price, or $15,448.68. In addition, HRR argues that Megee also owed HRR the difference from the expenditures on the job and the amount actually collected. Actual expenses were $37,577, and the actual amount collected was $32,875, for a difference of $4,732. We note that the difference between the actual expenses and the actual amount collected is $4,702, not $4,732. HRR argues that it is owed a total amount of $20,180 on the Hinson account. HRR is mistaken in its assertion that the Hinson contract price was $79,224. The record indicates that the Hinson contract price was $45,926, and the National Resort contract price was $79,224. There was a loss of $4,702 on the Hinson account. The trial court found that both Megee and Tucker were responsible for the problems with the performance of the contract, and it allocated the actual loss between the parties.

We do not find that the trial court was clearly erroneous in its allocation.

The contract price on the Gray account was $2,158. The court found the total expenses to be $2,160. The court awarded HRR one dollar. HRR argues that it was guaranteed 20% of the contract price, so the trial court should have awarded HRR $420.81. In its letter opinion, the trial court found that there was a dispute about the performance of the contract, which was not resolved until litigation was instituted, and the court was unable to determine fault regarding the Gray account. Therefore, the court resolved the dispute by allocating the loss between the parties. The trial court's findings were not clearly erroneous.

Finally, HRR argues that the trial court's reduction for expenses by 65% of the contract price is arbitrary and capricious. HRR argues that the agreement between Megee and HRR guarantees 20% of the customer contract price to HRR. HRR argues that the court's findings regarding Megee's commissions for the Byrd, Tatum, Stacklager, National Resort, Papineau, Alderson, Neubauer, and A. Williams accounts is "totally contrary to the express language of the employment agreement of [Megee]."

 Megee was terminated before he was given the opportunity to collect the accounts. Since the accounts needed to be finally settled for the parties, the trial court resolved the dispute by determining the contract price to be the amount collected and by reducing the contract price by 65% of the amount to be collected for expenses. This was based on Megee's testimony that each contract had a 35% profit margin. The court determined the commission by taking 97.5% of the determined contract price and multiplying by the applicable commission percentage of 16% on the Byrd, Tatum, and Stacklager accounts, and 11% on the National Resort, Papineau, Alderson, Neubauer, and Williams, A. accounts. The trial court's resolution of the dispute was not clearly erroneous.

In sum, we reverse the trial court's judgment of $25,920 to River City; we affirm the remainder of the trial court's judgment.

ARNOLD, C.J., not participating.