# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 05-2275/2276/2326

_____

| | | |
|---|---|---|
| Design Professionals Insurance Company, a California insurance company, | * * * * | |
| Appellee/Cross-Appellant, | * * | |
| v. | * * * | Appeals from the United States District Court for the Eastern District of Arkansas. |
| Chicago Insurance Company, an Illinois insurance company, | * * * | |
| Appellant/Cross-Appellee, | * * | |
| ESI Group, Inc., an Arkansas corporation, | * * * | |
| Appellee/Cross-Appellant. | * | |

_____

Submitted: February 16, 2006
Filed: July 21, 2006

_____

Before WOLLMAN, ARNOLD, and GRUENDER, Circuit Judges.

_____

ARNOLD, Circuit Judge.

The parties to this insurance action appeal various rulings by the district court. We affirm in part, reverse in part, and remand the case for further proceedings.

I.

Miller, England & Company (MEC) was an Arkansas accounting firm headed by Michael Miller. MEC carried what is called a claims-made professional liability insurance policy with the Chicago Insurance Company, a defendant in this action; such a policy provides coverage only for claims made against an insured during the policy period. MEC's agent for this policy was Rhodes & Associates; Chicago's agent was the Herbert H. Landy Insurance Agency. The one-year policy period ended on August 11, 1999. After the policy period ended, MEC had sixty days during which to report to Chicago any claims that were first made against MEC during the policy period. During the same sixty days, an endorsement to the policy gave MEC the right to buy what is called tail coverage, which would provide coverage for claims first made after the policy period expired that were based on conduct that had occurred prior to the policy's expiration date.

Burris, Adlong & Company (BAC), headed by Gary Burris and Rosemary Adlong, was another Arkansas accounting firm. BAC also carried claims-made liability insurance, which it purchased from plaintiff Design Professionals Insurance Company (DPIC). The policy period for BAC's insurance ended on September 1, 1999. According to the policy, firms that had been merged with or acquired by BAC were insured under the policy for up to thirty days following the effective date of the acquisition or merger. The policy did not define what constituted an acquisition or merger for the purpose of coverage.

After Ms. Adlong announced her intention to retire, Mr. Burris and the principals at MEC decided to combine the two accounting firms. Both firms sent notices of that decision to their clients, and on August 1, 1999, BAC closed its office and combined its operations with MEC, which changed its name to Burris, Miller & Company (BMC). BMC's principals abandoned the BAC corporate charter, and it was eventually revoked for failure to pay franchise taxes. At no time did MEC and BAC file articles of merger with the Arkansas Secretary of State.

With both firms now combined, BMC's principals chose DPIC as BMC's liability insurance provider. Accordingly, Rhodes sent Chicago's agent, Landy, a letter informing Chicago that MEC's claims-made policy would be allowed to expire; Landy, in turn, sent a letter to Rhodes confirming the expiration. In that letter, Landy mentioned that additional "extended reporting period options" were available. (The policy endorsement listed premiums for what it described as twelve-, thirty-six-, or sixty-month "extended reporting period[s].") In explaining those options, however, Landy's letter misstated what claims would come within the tail coverage. Although the endorsement to the policy stated that any tail coverage that MEC purchased would cover claims first made against it during the extended reporting period, the letter suggested that any "extended reporting period option" would cover only claims that were first made against MEC before the policy's August 11 expiration date. Thus the letter implied that any tail coverage would not cover claims first made after MEC's policy expired.

On August 19, eight days after MEC's policy expired, the president of ESI Group, Inc., telephoned Mr. Miller and made a claim against him, MEC, and an MEC employee, Stan Parks, for damages stemming from an audit that Mr. Parks had performed for ESI. Mr. Miller promptly notified Rhodes of the claim, who in turn informed Landy. Chicago wrote to Mr. Miller, telling him that because the claim had not been first made during the policy period, it was not covered by the automatic extended reporting coverage. In that letter, Chicago did not mention that MEC could still purchase tail coverage that would include the ESI claim.

While Mr. Miller notified Rhodes of the ESI claim, Mr. Burris contacted DPIC's agent to let him know about the claim. At first, DPIC refused to provide a defense. Once ESI filed suit in state court against MEC, Mr. Parks, and Mr. Miller (the MEC defendants), however, DPIC agreed to defend them under a reservation of rights, which preserves an insurer's right to deny that the policy covers a claim. On the eve of the ESI trial, the parties entered into a settlement agreement: DPIC paid

$100,000 to ESI and agreed to pay an additional $600,000 if it was later determined that its policy with MEC covered ESI's claim, Mr. Parks agreed to a consent judgment against him for $1,000,000, and ESI agreed to look only to insurance coverage for payment on its claims. In a separate agreement, the MEC defendants assigned all of their rights against Chicago (MEC's original insurer) to DPIC.

While the state lawsuit was pending, DPIC filed this action in district court, naming Chicago and ESI as defendants. DPIC sought a declaration that its policy did not provide coverage for ESI's claim, as well as partial reimbursement from Chicago for payments that it (DPIC) had already made on that claim. ESI filed a cross-claim against Chicago to recover on the $1,000,000 consent judgment entered against Mr. Parks. The parties moved for summary judgment. The district court granted partial summary judgment to DPIC, declaring that its policy did not provide coverage for the ESI claim because BAC, the purchaser of the policy, had not merged with MEC under Arkansas law. The court granted summary judgment to Chicago on DPIC and ESI's estoppel claims. On breach of contract claims against Chicago filed by DPIC and ESI, the district court concluded that Chicago was required to provide MEC with certain information about tail coverage, and a jury found that Chicago had not done so. The district court entered a judgment against Chicago based on the jury verdict. Chicago appealed, and DPIC and ESI filed cross-appeals.

II.

A.

DPIC and ESI alleged that Chicago breached its contract with MEC by failing to disclose that any tail coverage that MEC purchased would have covered the ESI claim. They asserted that the duty to disclose that fact arose from Ark. Code Ann. § 23-79-306(3)(B), which requires that a notice of termination of insurance must inform an insured that an extended period endorsement is available for purchase, and they relied on "the general rule that a statute governing insurance coverage becomes part of a policy affected by it," *First Sec. Bank of Searcy v. Doe*, 297 Ark. 254, 257,

760 S.W.2d 863, 865 (1988). In denying summary judgment motions filed by DPIC and ESI, the district court agreed that § 23-79-306(3)(B) obligated Chicago to send a notice of termination explaining the availability and importance of tail coverage, but it determined that a material issue of fact remained as to whether Chicago satisfied that obligation by sending the Landy letter. That issue was submitted to a jury, which found in favor of DPIC and ESI. The district court denied Chicago's motion for judgment as a matter of law, and it entered a judgment for DPIC and ESI based on the jury verdict.

We review *de novo* the district court's interpretation of a specific provision of the Arkansas Code. *See BancInsure, Inc. v. BNC Nat'l Bank, N.A.*, 263 F.3d 766, 770 (8th Cir. 2001). Section 23-79-306(3)(B) states that "[a]ny notice of termination of a claims-made policy must include a disclosure advising the insured and his or her agent of the availability of and premium for an extended reporting period endorsement and the importance of purchasing the coverage." The issue here is whether Arkansas law requires an insurer to send a notice of termination when the insured simply allows the policy to expire. DPIC and ESI argue that a "termination" within the meaning of § 23-79-306(3)(B) occurs whenever a policy ends, regardless of whether it is cut short or merely expires of its own terms. Chicago disagrees, arguing that a termination occurs only when the insurer or the insured take some affirmative step to end an existing policy.

Where a term in a statute is clear and unambiguous, it will be given its ordinary meaning. *Cash v. Arkansas Comm'n on Pollution Control & Ecology*, 300 Ark. 317, 320, 778 S.W.2d 606, 607 (1989). A statutory term is ambiguous when it is capable of two or more constructions, or when it is so unclear that reasonable minds could disagree or be uncertain as to its meaning. *R.K. Enter., L.L.C. v. Pro-Comp Mgmt., Inc.*, 356 Ark. 565, 572, 158 S.W.3d 685, 688 (2004). When an ambiguity exists, the court will interpret the provision in a way consistent with the legislature's intent. *Central & S. Cos. v. Weiss*, 339 Ark. 76, 80, 3 S.W.3d 294, 297 (1999). That intent

may be divined by looking "to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that throw light on the subject." *Saforo & Assocs., Inc. v. Porocel Corp.*, 337 Ark. 553, 565, 991 S.W.2d 117, 124 (Ark. 1999).

The subtitle of the Arkansas Code dealing with insurance does not provide a definition for the word termination, nor is the term consistently employed throughout that subtitle. In some instances, the legislature clearly meant for the words "terminate" or "termination" to refer only to the unilateral actions of the insurer in cutting a policy short. *See, e.g.*, Ark. Code Ann. § 23-66-206(14)(F). But other sections use the word "terminate" merely as a synonym for "end," without implying that such an end need arise from the actions of either the insurer or the insured. *See, e.g.*, Ark. Code Ann. § 23-79-123(a)(1). Such varied use provides us no guidance with respect to what the legislature intended when it used the word "termination" in § 23-79-306(3)(B).

Another guide to what the legislature intended is the purpose that the statute was meant to serve. DPIC and ESI both contend that § 23-79-306(3)(B) is intended to make insureds aware that tail coverage is available and to help them understand what it covers. Because such coverage can often be confusing, they argue that the statute's purpose would be frustrated if an insurer has to provide information only when the insurer ends the policy before its natural expiration date.

In *Jarboe v. Shelter Ins. Co.*, 307 Ark. 287, 819 S.W.2d 9 (1991), the Arkansas Supreme Court looked at the purpose behind another notification statute, Ark. Code Ann. § 17-30-210(c)(1) (now renumbered as § 17-37-210(c)(1)). That statute states that an insurance company cannot cancel or terminate a pest control company's policy without giving the state regulatory board thirty days' notice. The court concluded that the insurance company was required to notify the board regardless of how the policy

ended.  The court reasoned that the purpose of the relevant statute was to protect the public against uninsured pest control providers, a goal that could not be accomplished if an insurer needed to notify the board only when it prematurely ended the policy. The court therefore concluded that the legislature must have intended to require such notification even where the policy lapsed due to non-payment or expired of its own terms.  Because the insurer had not notified the board, it remained liable to third parties under the policy.  *Jarboe*, 307 Ark. at 288-91, 819 S.W.2d at 10-11.

We do not believe that the purpose behind the statute applicable to our case, however, justifies the broad construction that DPIC and ESI would have us give it. When a policy is cut short by an insurer, the insured may be suddenly left without coverage.  In an attempt to avoid prejudice from an unexpected loss of claims-made coverage, § 23-79-306(3)(B) requires the insurer to explain that the insured can purchase coverage for claims that are made after the policy's expiration date.  But no similar exigency exists where the insured has allowed the policy to end by its own terms:  The policy expires naturally, and the coverage ends because the insured tells the insurer not to renew the policy.  Such an insured has ample opportunity to study the policy and learn of his or her rights under it.  Had the Arkansas General Assembly intended § 23-79-306(3)(B) to apply in these circumstances, it had broader language at its disposal that it could have employed.  We conclude therefore that Chicago was under no statutory duty to provide MEC with a notice of termination, and therefore the district court erred in concluding that DPIC and ESI could base their breach of contract claim on a violation of § 23-79-306(3)(B).

B.

DPIC and ESI also contended that Chicago breached its insurance contract with MEC by violating Rule 43 of the Arkansas Insurance Department.  That rule prohibits insurers from concealing or failing to disclose to "first party claimants" all of the benefits, coverages, or other provisions of an insurance policy pertinent to a claim. Ark. Ins. Rule 43 § 9(g), (h).  According to DPIC, Chicago violated Rule 43 because

-7-

it used the Landy letter to conceal from MEC the provisions and coverages of MEC's insurance policy. Chicago argues that the district court erred in denying its motion for judgment as a matter of law, which was based, in part, on the ground that Rule 43 did not create a private cause of action and thus no violation of Rule 43 could amount to a breach of its contract with MEC. We review the district court's denial of Chicago's JAML motion *de novo*. *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1123 (8th Cir. 2006).

The Arkansas insurance commissioner cited the Arkansas Trade Practices Act, which "regulate[s] trade practices in the business of insurance," Ark. Code Ann. § 23-66-202, as authority for promulgating Rule 43. Ark. Ins. Rule 43, § 2; *see* Ark. Code Ann. § 23-66-207. Though the Commissioner also cited other Arkansas statutes as authority for the rule, those statutes refer to more general matters, such as the power of the insurance department to promulgate regulations (Ark. Code Ann. § 23-61-108) and the definitions in the Arkansas Administrative Procedure Act (Ark. Code Ann. § 25-15-202). Therefore we believe that Rule 43 was intended to implement the Trade Practices Act, and, while the Act gives the state authority to establish rules of conduct and to punish offenders, it provides no private right of action to insureds for violations of the Act or of regulations promulgated under the Act's authority. Ark. Code Ann. § 23-66-202; *see also Columbia Mut. Ins. Co. v. Home Mut. Fire Ins. Co.*, 74 Ark. App. 166, 174, 47 S.W.3d 909, 913 (2001).

The purpose of Rule 43 was to establish "certain minimum standards" to control how insurance companies settle claims. Ark. Ins. Rule 43, § 1. The rule places a duty on an insurer to settle claims in a manner that complies with the standards set forth in the rule, and if an insurer repeatedly disregards those standards the state insurance department may proceed against it. *See id.* But because the insurer owes the duty to the state, not to the individual insured, the insured has no private right of action for a breach of that duty. We therefore conclude that the district court erred in holding that Rule 43 was incorporated into the Chicago-MEC insurance policy.

-8-

In addition, we question whether the requirements of Rule 43 even apply to the circumstances present here. DPIC and ESI argue that Chicago violated § 9(g) and (h) of the rule when the Landy letter misstated the coverage that an extended reporting period option would have provided to MEC. As we noted above, these sections of the rule prohibit insurers from concealing or failing to disclose specific information about the policy to first-party claimants. Section five of the rule defines a first-party claimant as an individual who asserts a right to payment or services under an insurance contract because of the occurrence of a contingency or loss that the contract covers. A classic example of this would be a beneficiary who seeks to collect the proceeds of a deceased loved one's life insurance policy; the beneficiary is a first-party claimant because a contingency or loss has occurred that allows him or her to make a claim under the policy. In this case, though, the Landy letter was sent to Rhodes more than a week before MEC became aware of a claim. Because there was no claim for which MEC could assert a right to any payment or defense from Chicago, we do not think that MEC was a first-party claimant within the meaning of the rule. We therefore doubt that any misstatements in the Landy letter amounted to a violation of Rule 43.

## C.

For the above reasons, we reverse the judgment entered against Chicago on DPIC and ESI's breach of contract claims.

## III.

All the parties to this litigation agree that had MEC purchased the extended reporting period endorsement from Chicago, the endorsement would have provided MEC with coverage for the ESI claim. Mr. Miller said in an affidavit that he would have purchased tail coverage had he known that it would have covered the ESI claim, and that MEC relied on the statements made in the Landy letter when it decided not to buy tail coverage. Because the statements in the letter were incorrect, DPIC and

ESI contended that Chicago should be estopped from denying coverage for the ESI claim. The district court granted summary judgment to Chicago on the estoppel claim. We review the grant of summary judgment *de novo*. *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005).

An equitable estoppel precludes a party from invoking a right that it could have otherwise asserted. *Clemmons v. Office of Child Support Enforcement*, 345 Ark. 330, 352, 47 S.W.3d 227, 242 (2001) (Imber, J., concurring). The party seeking estoppel has the burden to prove that the party to be estopped knew the facts and intended that the conduct be acted on or acted so that the party asserting the estoppel had a right to believe that it was so intended, and that the party asserting the estoppel was ignorant of the facts, relied on the other's conduct, and was injured because of that reliance. *Shelter Mut. Ins. Co. v. Kennedy*, 347 Ark. 184, 187, 60 S.W.3d 458, 460 (2001).

The Arkansas Supreme Court has held that the doctrine of estoppel, which it described as "defensive in character," may not be used to enlarge or extend the coverage available under an insurance contract, nor may it be used to create an insurance contract. *Peoples Protective Life Ins. v. Smith*, 257 Ark. 76, 84-88, 514 S.W.2d 400, 406-08 (Ark. 1974); *see Harasyn v. St. Paul Guardian Ins. Co.*, 349 Ark. 9, 19, 75 S.W.3d 696, 701-02 (2002). Though the Arkansas Court of Appeals has indicated that exceptions to this rule exist, *see Time Ins. Co. v. Graves*, 21 Ark. App. 273, 278-80, 734 S.W.2d 213, 215-17 (1987) (en banc), the district court reasoned that the facts of this case did not require it to deviate from the general rule. We agree with this conclusion, and also note our uneasiness about whether *Graves* can be reconciled with *Harasyn* and *Peoples Protective Life* in any event.

IV.

Chicago and ESI challenge the district court's summary judgment determination that DPIC's policy did not cover ESI's claim. According to DPIC's policy with BAC, firms that BAC merged with or acquired were covered for thirty days. The parties do not dispute that MEC and BAC finished combining their operations on August 1, 1999, nineteen days before ESI first made a claim against MEC. If the combination of operations was a merger under the DPIC policy, then the policy covered the claim. The district court concluded that under the terms of the policy in order for two firms to "merge" they had to comply with the provisions of Ark. Code Ann. § 4-32-1203. Under that statute, a merger is not complete until the companies wishing to merge file articles of merger with the Arkansas Secretary of State. *Id.* Because the two firms never filed any such articles, the district court determined that they had not merged.

"The language in an insurance policy is to be construed in its plain, ordinary, popular sense." *Farmers Home Mut. Fire Ins. Co. v. Bank of Pocahontas*, 355 Ark. 19, 23, 129 S.W.3d 832, 835 (2003). If a policy does not define a word, Arkansas courts may look to a standard English-language dictionary to determine its common meaning. *See State Farm Fire & Cas. Co. v. Midgett*, 319 Ark. 435, 438, 892 S.W.2d 469, 471 (1995). Where a term is unambiguous, the court will give effect to its plain meaning. *Id.* If a term is ambiguous, however, the court will "construe the policy liberally in favor of the insured and strictly against the insurer." *Castaneda v. Progressive Classic Ins. Co.*, 357 Ark. 345, 351, 166 S.W.3d 556, 560-61 (2004). A term in a policy is ambiguous when there is doubt as to its meaning and it is susceptible to two or more reasonable interpretations. *Harasyn*, 349 Ark. at 18, 75 S.W.3d at 701.

The issue here is whether two firms can be deemed to have merged, for the purposes of the policy, when they combine their operations. The Oxford English Dictionary defines a merger as "[t]he combination or consolidation of one firm or trading company with another." Oxford English Dictionary (2d ed. 1989). Another

dictionary similarly defines a merger as "any of various methods of combining two or more business concerns." Webster's Third New International Dictionary 1414 (1986). In neither of these definitions is the term merger restricted in a way that excludes business combinations that do not follow a specific statutory framework.

DPIC argues that a combination of operations cannot be considered a merger, as two separate legal entities still existed after the combination was complete. But what remained of BAC was merely a husk, an empty shell of a corporation. While BAC continued to live on as a legal matter after August 1, it had functionally ceased to exist. We therefore conclude that the parties to the insurance agreement could quite obviously have intended the word "merger" to encompass the combination that MEC and BAC effected. And even though DPIC's suggested definition of merger is also plausible, it merely creates an ambiguity in the contract, which must be resolved in favor of coverage, *see Castaneda*, 357 Ark. at 351, 166 S.W.3d at 560-61. We conclude that the district court erred in granting DPIC's summary judgment motion.

V.

For the foregoing reasons, we affirm the ruling of the district court as to estoppel, reverse on all other issues, and remand the case to the district court for further proceedings not inconsistent with this opinion.

_____

-12-