The Honorable Brent Haltom Prosecuting Attorney Eighth Judicial District South Room 6, Miller County Courthouse Texarkana, Arkansas 71854
Dear Mr. Haltom:
I am writing in response to your request for an opinion on four questions regarding the constitutionality of House Bill 2384, which was introduced but not adopted at the regular 2007 session of the Eighty-Sixth General Assembly. Specifically, you note that HB 2384, if enacted, would, among other things:
Lower the campaign contribution limits from the current limit of $2,000 per election to $1,000;
Allow a candidate to make a contribution to another candidate's campaign, but limit that contribution to $250 per election and allow that candidate to contribute a total of $1,250 per election;
Treat two or more business entities which have majority ownership by the same majority owner as a single person for the purpose of making a contribution or contributions to a candidate for each election.
You request my opinion on the following four questions regarding these aspects of the bill:
Does the reduction of the Arkansas campaign contribution limits from $2,000 per election for a person to $1,000 per election violate the First
Amendment rights of individuals as stated in Buckley v. Valeo, 424 U.S. 1,965 S.Ct. 612, 46 L.Ed2d 659 (1976) and cases that follow including the Arkansas campaign contribution limit case of Russell v. Burris,978 F.Supp. 1211 (E.D. Ark. 1997), aff'd in part and rev'd in part,146 F.3d 563 (8th Cir. 1998), cert. denied ___ U.S. ___, 119 S.Ct. 510, 142 Le.Ed.2d 423 (1998)?
Does the provision of HB 2384 prohibiting certain business entities from contributing to political campaigns based on the ownership of those business entities violate the First Amendment or Equal Protection clause of the U.S. Constitution?
Does the provision of HB 2384 allowing a candidate to donate from his campaign fund to another candidate's campaign fund without allowing an officeholder who is not a candidate to donate from his holdover campaign fund violate the equal protection clause?
Does the provision of HB 2384 allowing a candidate to donate from his campaign fund to another candidate only $250 per election set up a special class of contributors that:
Allows a candidate to contribute $250 from his campaign account and $1,000 from his personal funds per election, thereby being allowed to contribute more than anyone else and violating the Equal Protection clause, and
Violate the equal protection clause as it limits the campaign committee to a $250 contribution per election when other entities can contribute $1,000. Is there a compelling state interest justifying this low limit and does this low limit violate the constitutional rights of Arkansas?
RESPONSE
I must state as an initial matter that it is difficult to analyze these issues in a bare legal opinion without a detailed factual record or adversary arguments as to the asserted interests at stake. I must necessarily theorize, therefore, as to the asserted governmental objectives and as to the possible proof supporting competing allegations. With that in mind, in my opinion, in response to your first question, the campaign contributions limits contained in HB 2384 would likely be upheld as constitutional under current United States Supreme Court precedent. I must caution, however, that the United States Supreme Court, in the period since the addition of two new members, has evidenced a more stringent approach to campaign finance restrictions. It is fair to say that the newly-constituted U.S. Supreme Court's jurisprudence on this topic is in a state of flux. In response to your second question concerning the aggregation of "business entity" contributions, it is constitutional, in my opinion, to aggregate business entity contributions with a carefully drafted measure. In my opinion, however, the relevant portion of House Bill 2384 in this regard may be subject to constitutional attack. The current drafting of this provision in House Bill 2384, because of internal inconsistencies and potential under-inclusiveness, is in my opinion subject to First Amendment and Equal Protection Clause challenges. In response to your third question, I can theorize no rational distinction between the use of a candidate's campaign funds to make contributions to other candidates and an officeholder's use of his "holdover" funds for this purpose. As a consequence, this portion of House Bill 2384 may be unconstitutional under the Equal Protection Clause. In response to your fourth question, in my opinion no equal protection violation exists between candidates and other non-candidate/officeholder contributors under the circumstances you describe because the more general class of contributors are not "similarly situated" to candidates with campaign funds. Finally, in my opinion, the $250 limit on inter-candidate transfers is not unconstitutionally low.
Question 1 — Does the reduction of the Arkansas campaign contribution limits from $2,000 per election for a person to $1,000 per election violate the First Amendment rights of individuals as stated in Buckley v. Valeo, 424 U.S. 1, 965 S.Ct. 612, 46 L.Ed2d 659 (1976) and cases that follow including the Arkansas campaign contribution limit case of Russell v. Burris, 978 F.Supp. 1211 (E.D. Ark. 1997), aff'd in part and rev'd in part, 146 F.3d 563 (8th Cir. 1998), cert. denied ___ U.S. ___,119 S.Ct. 510, 142 Le.Ed.2d 423 (1998).
In my opinion, the campaign contributions limits contained in HB 2384 would likely be upheld as against a constitutional challenge under existing U. S. Supreme Court precedent. Several cases more recent than Buckley v. Valeo have been decided by the United States Supreme Court and bear upon the question. In one of those, state contribution limits in Missouri were upheld. Nixon v. Shrink Missouri Government PAC, 528 U.S. 377
(2000). In another, Randall v. Sorrell, ___ U.S. ___, 126 S.Ct. 2479
(2006), more stringent state contribution limits in Vermont were struck down. In terms of stringency, the contribution limits that would be imposed by House Bill 2384 fall somewhere between the Missouri and Vermont laws. Under the existing jurisprudence, the HB 2384 contribution limits are more analogous to those upheld in Shrink than to those struck down in Randall. Therefore, the campaign contributions limits contained in HB 2384 would have a strong chance of being upheld under that case law. The composition of the Court changed between the decisions in Shrink and Randall, however. It is thus difficult to predict the fate of the HB 2384 limits before the currently-constituted United States Supreme Court. It does not appear, at least at this date, that another more recent decision of the Supreme Court holding a particular application of federal campaign expenditure restrictions unconstitutional (see Federal Election Commission v. Wisconsin Right to Life, ___ U.S. ___,127 S.Ct. 1928 (2007)), has substantially altered the Court's prior jurisprudence regarding the constitutionality of campaign contribution restrictions. It is fair to say, however, that the newly-constituted U.S. Supreme Court's jurisprudence on this topic is in a state of flux.
In Buckley v. Valeo, 424 U.S. 1 (1976), the Court upheld a $1,000 campaign contribution limit imposed by federal law and applicable to federal campaigns. In the more recent Randall case, the plurality summarized the Buckley holding as follows:
Buckley recognized that contribution limits, like expenditure limits `implicate fundamental First Amendment interests,' namely the freedoms of `political expression' and `political association.' 424 U.S., at 15, 23. But, unlike expenditure limits (which "necessarily reduc[e] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," id., at 19), contribution limits "involv[e] little direct restraint on" the contributor's speech, id., at 21. They do restrict "one aspect of the contributor's freedom of political association," namely, the contributor's ability to support a favored candidate, but they nonetheless "permi[t] the symbolic expression of support evidenced by a contribution," and they do "not in any way infringe the contributor's freedom to discuss candidates and issues." Id., at 21, 24.
Consequently, the Court wrote, contribution limitations are permissible as long as the Government demonstrates that the limits are "closely drawn" to match a "sufficiently important interest." Id., at 25. It found that the interest advanced in the case, "prevent[ing] corruption" and its "appearance," was "sufficiently important" to justify the statute's contribution limits. Id., at 25-26.
The Court also found that the contribution limits before it [in Buckley] were "closely drawn." It recognized that, in determining whether a particular contribution limit was "closely drawn," the amount, or level, of that limit could make a difference. Indeed, it wrote that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." Id., at 21. But the Court added that such "distinctions in degree become significant only when they can be said to amount to differences in kind." Id., at 30. Pointing out that it had "no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000," ibid., the Court found "no indication" that the $1,000 contribution limitations imposed by the Act would have "any dramatic adverse effect on the funding of campaigns," id., at 21. It therefore found the limitations constitutional.
Randall v. Sorrell, supra at 2491 (discussing the holding in Buckley v. Valeo).
Since Buckley, some salient points regarding contribution limitations can be derived from U.S. Supreme Court case law: 1) "[contribution] restrictions [bear] more heavily on . . . associational rights than on freedom to speak," (Shrink, supra at 388); 2) "strict scrutiny" analysis is not applicable to a review of campaign contribution limits — less rigorous "closely drawn" standard is appropriate (McConnell v. Federal Election Commission, 540 U.S. 93, 137 (2003)); 3) contribution limits impose serious burdens on First Amendment rights only if they are so low as to "preven[t] candidates and political committees from amassing the resources necessary for effective advocacy" (Id. at 135, quoting Buckley); and 4) the fact that a new law may reduce the relative amount of money available over previous election cycles is "largely inconsequential," the question being instead whether the reduction is "so radical in effect as to . . . drive the sound of [the recipient's] voice below the level of notice." Id. at 173, (quoting Shrink in analyzing the analogous question of limitations on soft money contributions to political parties).
In analyzing the constitutionality of House Bill 2384, it is necessary to review its specific provisions under the standards set out above and to compare its provisions with provisions of similar laws upheld or struck down by the Supreme Court.
House Bill 2384 would amend two existing subsections (a) and (b) of A.C.A. § 7-6-203 to provide as follows:
(a)(1)(A) It shall be unlawful for any candidate for any public office, except the office of Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands, or for any person acting on the candidate's behalf to accept campaign contributions in excess of two thousand dollars ($2,000) one thousand dollars ($1000) per election from any person.
(B) A candidate may accept a campaign contribution or contributions up to the maximum amount from any prospective contributor for each election, whether opposed or unopposed.
(2)(A) It shall be unlawful for any candidate for the office of Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands, or for any person acting on the candidate's behalf to accept campaign contributions in excess of two thousand dollars ($2,000) one thousand dollars ($1,000) per election from any person.
(B) A candidate may accept a campaign contribution or contributions up to the maximum amount from any prospective contributor for each election, whether opposed or unopposed.
(b)(1)(A) It shall be unlawful for any person to make a contribution to a candidate for any public office, except the office of Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands, or to any person acting on the candidate's behalf, which in the aggregate exceeds two thousand dollars ($2,000) one thousand dollars ($1,000) per election.
(B) A person may make a contribution or contributions up to the maximum amount to a candid ate for each election, whether opposed or unopposed.
(2)(A) It shall be unlawful for any person to make a contribution to a candidate for the office of Governor, Lieutenant Governor, Secretary of State, Treasurer of State, Auditor of State, Attorney General, and Commissioner of State Lands, or to any person acting on the candidate's behalf, which in the aggregate exceeds two thousand dollars ($2,000) one thousand dollars ($1,000) per election.
(B) A person may make a contribution or contributions up to the maximum amount to a candidate for each election, whether opposed or unopposed.
"Person" is defined in the applicable subchapter as including "any individual, proprietorship, firm, partnership, joint venture, syndicate, labor union, business trust, company, corporation, association, committee, or any other organization or group of persons acting in concert." It also includes "organized political parties . . . county political party committees, and legislative caucus committees." Other portions of A.C.A. § 7-6-203, which would be left unamended by HB 2384, provide that: "The limitation shall not apply to a candidate's own contribution from his or her personal funds or to personal loans made by financial institutions to the candidate and applied to his or her campaign" and that ". . . an organized political party as defined in §7-1-101 may contribute up to two thousand five hundred dollars ($2,500) to each of the party's candidates per election. A.C.A. § 7-6-203(c) and (d) (Supp. 2005).
As you note, therefore, House Bill 2384 would generally "lower the campaign contribution limits from the current limit of $2,000 per election to $1,000."[1]
As discussed above, the Buckley Court upheld $1,000 contribution limits imposed by federal law on federal elections. The Court concluded that there was no indication that the $1,000 contribution limitation imposed by the Act would "have any dramatic adverse effect on the funding of campaigns and political associations." Id. at 21. The Court noted that "[t]he overall effect of the Act's contribution ceilings is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression." Id. at 21-22.
The other case you cite in your request, Russell v. Burris, 146 F.3d 563
(8th Cir. 1998), cert denied 525 U.S. 1001 (1998), struck down contribution limits adopted by virtue of an Arkansas initiated act. That act set contribution limits at $300 for the state's seven executive constitutional officers and at $100 for all other state public offices. See former A.C.A. § 7-6-203 (as amended by Init. Act 1 of 1996). In Russell, the Eighth Circuit first held that insufficient proof had been presented of corruption or the perception of corruption stemming from large contributions. Such showing, in the court's view, was necessary to demonstrate the requisite state interest in imposing the limits. The court applied a "strict scrutiny" standard of review. Id. at 568. The court held that the $300 and $100 limits were "too low to allow meaningful participation in protected speech and association." Id. at 570. The court, issuing its decision in 1998, also cited the impact of inflation since the 1976 Buckley decision, stating that:
. . . inflation has eroded approximately 60 percent of the value of a dollar since 1976. A $1,000 contribution in 1976 would thus be worth about the same as a $2,500 contribution today. We recognize that the contribution limit upheld in Buckley does not constitute a constitutional minimum and that we may not fine-tune the contribution limits established by Act I. [Citation omitted]. We must, however, invalidate the contribution limitations if they are different in kind from those that Buckley upheld.
Id. at 570.
The Eighth Circuit in Russell v. Burris thus held that the $300 and $100 limits were "dramatically lower than, and different in kind from, the limits approved in Buckley and thus are unconstitutionally low." Id. at 571. Certiorari was denied by the United States Supreme Court. See525 U.S. 1001 (1998).
Two years after the Eighth Circuit's decision in Russell, the U.S. Supreme Court accepted certiorari in another case addressing the constitutionality of state campaign contribution limits. See Nixon v. Shrink, supra. This appeal involved a different contribution limits case decided by the Eighth Circuit, this one arising in Missouri. See Shrink Missouri Government Pac v. Adams, 161 F.3d 519 (8th Cir. 1998). The Eighth Circuit, as in Russell v. Burris above, had struck down the applicable Missouri contribution limits. In Shrink, the U.S. Supreme Court reversed the Eighth Circuit and upheld a Missouri law setting campaign contribution limits of $1,000 per election per candidate for statewide elections. The limits were indexed for inflation each even-numbered year according to the Consumer Price Index and were set at $1,075 for statewide officeholders at the time the lawsuit in Shrink was filed.
In Nixon v. Shrink, the U.S. Supreme Court characterized the principal issues as being whether Buckley was authority for the states to impose limits on contributions to state political candidates and whether the federal limits approved in Buckley, with or without adjustment for inflation, defined the scope of the permissible state limitations. Id. at 381-382. The Court held that Buckley was authority for comparable state contribution limits and that the limits "need not be pegged to Buckley's dollars." The Court reversed the Eighth Circuit Court of Appeals application of strict scrutiny in favor of the "closely drawn" standard and rejected the notion (accepted by the Eighth Circuit), that the State of Missouri was required to "justify the invocation of [the State's] interests with empirical evidence of actually corrupt practices or of a perception among Missouri voters that unrestricted contributions must have been exerting a covertly corrosive influence." Id. at 390-391. The Court stated that "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." Id. at 391. The Court also held that in the Shrink case, as in Buckley, "[t]here is no indication . . . that the contribution limitations imposed by the [law] would have any dramatic[ally] adverse effect on the funding of campaigns and political associations," and thus no showing that "the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." Id. at 395-396, quoting Buckley, supra. With regard to any arguments about the effects of inflation, the Court stated:
Respondents seem to assume that Buckley set a minimum constitutional threshold for contribution limits, which in dollars adjusted for loss of purchasing power are now well above the lines drawn by Missouri. But this assumption is a fundamental misunderstanding of what we held.
In Buckley, we specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate. As indicated above, we referred instead to the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to "amas[s] the resources necessary for effective advocacy," 424 U.S., at 21. We asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless. Such being the test, the issue in later cases cannot be truncated to a narrow question about the power of the dollar, but must go to the power to mount a campaign with all the dollars likely to be forthcoming. As Judge Gibson put it, the dictates of the First
Amendment are not mere functions of the Consumer Price Index.161 F.3d, at 525 (dissenting opinion).
Id. at 396-397.
It has been stated that the Shrink decision is "of immediate importance to states in the Eighth Circuit because the Court rejected the Eighth Circuit's rigid approach to analyzing contribution limits" and that it "implicitly halted the Eighth Circuit's stringent treatment of state campaign finance measures. . . ." Note, First Amendment — Campaign Finance Reform — The Supreme Court Halts the Eighth Circuit's Invalidation of Sate Campaign Contribution Limits, 23 U.A.L.R. 243, at 269 and 271 (Fall 2000). Later Eighth Circuit decisions have shifted course since Shrink. See Minnesota Concerned Citizens for Life Inc. v. Kelley, 427 F3d 1106 (8th Cir. 2005) (upholding Minnesota aggregate contribution limits from PACS, political funds, lobbyists and large contributors and ban on transfers between candidates' political committees).[2]
A more recent case of the United States Supreme Court addressing the constitutionality of campaign contribution limits must also be considered, however. In Randall v. Sorrell, ___ U.S. ___, 126 S.Ct. 2479
(2006), at issue was a Vermont law limiting contributions to statewide officers to $400 per election cycle ($200 each for the primary and general elections). Prior Vermont law had allowed contributions by individuals and corporations of up to $1,000. Political committees were subject to the same limits and the law treated local, state, and national affiliates of political parties as a single entity for purposes of the $400 contribution limit. The limits were not indexed for inflation. The Vermont law also imposed a limit of $2,000 on the amount any individual could give to a political party during the two-year election cycle.
In a plurality decision with five separate opinions, the Court struck down the Vermont limits. Justice Breyer, joined by new Chief Justice Roberts, first set out the Court's task as being to determine whether Vermont's limits "prevent candidates from `amassing the resources necessary for effective [campaign] advocacy.'" Id. at 2492, citing Buckley. He noted the Court's consistent upholding of contribution limits since Buckley and the Court's predilection to defer to legislative determinations on the topic. Id. at 2492. He stated, however, that "[n]onetheless . . . we must recognize the existence of some lower bound" because "[a]t some point the constitutional risks to the democratic electoral process become too great." "[W]here there is strong indication in a particular case, i.e., danger signs, that such risks exist (both present in kind and likely serious in degree), courts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute's "tailoring," that is, toward assessing the proportionality of the restrictions." Id. at 2492. Justice Breyer, joined by the new Chief Justice, concluded that "[t]he [Vermont] contribution limits are unconstitutional because in their specific details (involving low maximum levels and other restrictions) they fail to satisfy the First
Amendment's requirement of careful tailoring." Id. at 2485.
Justice Breyer focused on the fact that the Vermont limits applied "per election cycle," covering both the primary and general elections. He also stated that the $400 "per election cycle" limit was "the lowest in the Nation" and "well below the limits this Court upheld in Buckley" and well below the "lowest limit the court ha[d] previously upheld" (in Shrink). Justice Breyer also noted the impact of inflation on limits imposed after Buckley and noted that unlike the Missouri limits at issue in Shrink, the Vermont limits were not indexed for inflation. Justice Breyer concluded that these factors were "danger signs" that required the Court to examine the record carefully and independently to determine whether the limits were "closely drawn" to match the State's interests. Justice Breyer concluded that five factors indicated that the law was not closely drawn under this "tailoring analysis": 1) the limits would significantly restrict the amount of funding available for challengers to run competitive campaigns; 2) the Act's requirement that political parties and their affiliates together abide by exactly the same low contribution limits as other contributors threatens the right to associate in a political party; 3) the Act appeared to count the expenses of volunteers activities against the volunteer's contribution limit; 4) the limits are not adjusted for inflation; and 5) no special justification was put forth justifying such low limits. Justice Alito and Justice Kennedy concurred in this portion of Justice Breyer's opinion, in which new Chief Justice Roberts joined. Justices Scalia and Thomas also concurred in striking down the Vermont limits, but would have overruled Buckley and applied strict scrutiny. Justices Stevens, Souter and Ginsberg dissented and would have upheld the Vermont limits.
In my opinion the $1,000 contribution limits in House Bill 2384 would in all likelihood be upheld under the Randall plurality analysis outlined above. The $1,000 limit applies "per election" and not "per election cycle" like the Vermont limits. Although the $1,000 limit in HB 2384 is not indexed for inflation, it is not the "lowest in the Nation" or "well below" the limits the Supreme Court has upheld. The $1,000 limit is "nearly equivalent to the Missouri limits" upheld in Shrink (23 U.A.L.R. L. J. at 271) and is the same as that upheld in Buckley. The same "danger signs" found in Randall necessitating a careful review of the tailoring of the measure therefore do not appear to be present with regard to HB 2384.
If a court were faced with the task of evaluating the "tailoring" of HB 2384's $1,000 limit, the question of fact would be whether a reduction to a $1,000 limit would "prevent candidates from `amassing the resources necessary for effective [campaign] advocacy.'" A number of factors would be relevant to that analysis, including the record costs of last year's election cycle at all levels in Arkansas. Other factors would include, for example, the fact that House Bill 2384 would leave unamended the ability of a political party to contribute $2,500 per election per candidate. A.C.A. § 7-6-203(d) (Supp. 2005).[3]
On the whole, in my opinion, the portion of HB 2384 that would reduce campaign contribution limits from $2,000 per election to $1,000 per election would be constitutional under existing case law. I must caution, however, that the United States Supreme Court, in the period since the addition of two new members, has evidenced a more stringent approach to campaign finance restrictions. See, e.g., Randall, supra and Federal Election Commission v. Wisconsin Right to Life, Inc., ___ U.S. ___, 127 S.Ct. 1928 (June 25, 2007) (striking down as unconstitutional a particular application of the federal provision limiting "electioneering communications" by corporations). The Randall decision on contribution limits was badly divided, and it is difficult to predict the outcome of a case with facts less onerous than those in Randall. It does not appear that the more recent Wisconsin decision, which involved campaign expenditures, has altered the Randall test for analyzing the constitutionality of campaign contributions. It is fair to say, however, that the Court's jurisprudence on the topic of campaign finance is in a state of flux. Furthermore, the fact question surrounding the impact of such limits on an effective campaign would require more analysis than I am permitted to perform in an advisory opinion.
Question 2 — Does the provision of HB 2384 prohibiting certain business entities from contributing to political campaigns based on the ownership of those business entities violate the First Amendment or Equal Protection clause of the U.S. Constitution?
It is difficult to fully analyze this question without a complete adversarial proceeding in which evidence may be submitted. In my opinion, however, for purposes of the applicable constitutional test, this portion of House Bill 2384, because of internal inconsistencies and possible under-inclusiveness, may not be viewed as "closely drawn" to achieve the governmental objective. As a result this portion of HB 2384 is not constitutional, in my opinion. I reach this conclusion despite the fact that associational rights in making campaign contributions are minimal, and the state's interests in preventing corruption and the circumvention of the applicable contribution limits are sufficiently important. It is possible, in my opinion, to achieve the governmental purpose constitutionally with a carefully drafted measure. The current drafting of this provision, however, because of problems discussed specifically below, is in all likelihood subject to First Amendment and equal protection challenges. House Bill 2384 would add an additional section to the subchapter of the Arkansas Code governing campaign finance, as follows:
7-6-227. Contributions by business entities sharing the same majority owner.
As used in this section, "business entities" means proprietorships, firms, partnerships, joint ventures, syndicates, labor unions, business trusts, companies, corporations, associations, committees, or any other organization or group of persons acting in concert.
Two (2) or more business entities sharing the same majority owner shall be considered a single person for the purpose of making a contribution or contributions to a candidate for each election, whether opposed or unopposed.
(1) A candidate shall not knowingly accept campaign contributions from two (2) or more business entities sharing the same majority owner which, in the aggregate, exceed the campaign contribution limit under A.C.A. § 7-6-203 (a) and (b).
(2) If a candidate determines that he or she unknowingly accepted a contribution or contributions that violates subdivision (c)(1) of this section, the candidate shall return the contribution or contributions to the business entity within five (5) days of the determination.
Scope
As an initial matter, it is necessary to determine the precise scope of this provision. This provision doesn't exactly, as you state in your question, "prohibit certain business entities from contributing to political campaigns based on the ownership of those business entities." It treats two or more business entities sharing the same majority owner as one "person" for purpose of the applicable contribution limits. Such entities may still make campaign contributions, but may do so only up to one $1,000 combined limit. Three points must be made from the outset with regard to the scope of this provision.
First, the definition of "business entities" in the bill is very broad, including the specifically enumerated proprietorships, firms, partnerships, joint ventures, syndicates, labor unions, business trusts, companies, corporations, associations, and committees, as well as "any other organization or group of persons acting in concert."[4] This stated definition of the term "business entities," is not restricted to entities engaged in business or commercial enterprises. The definition is thus broad enough to include nonprofit corporations, political advocacy groups, or any other conceivable "associations" or "groups of persons acting in concert." The only salient portion of the bill applying this definition, however, treats groups that "shar[e] the same majority owner" as a single person for the purpose of making political contributions to candidates. It is thus impossible to apply this portion of the bill to nonprofit entities or other entities or groups that are not organized with an "owner." Nonprofit corporations and unincorporated associations or groups typically are not organized with stock and thus do not have "owners." See, e.g., A.C.A. § 4-28-219 (Repl. 2001); Allen v. Malvern Country Club, 295 Ark. 65, 746 S.W.2d 546 (1988) (nonprofit corporations are not authorized to have stock); and Manhattan Eye, Ear Throat Hospital v. Spitzer, 186 Misc.2d 126, 715 N.Y.S.2d 575 (N.Y.Sup. Ct 1999) (". . . a nonprofit corporation has no `owners'. . ."). See also A.C.A. § 4-28-205 (Repl. 2001) (apparently authorizing labor unions to organize as nonprofit corporations).[5] See also generally, 51 C.J.S. Labor Relations §§ 67 and 75. As a consequence, the bill's broad inclusion of entities such as nonprofit corporations, labor unions, "associations" and "committees" as well as other "organization[s] or group[s] of persons acting in concert" is ineffectual because the salient portion of the bill does not act upon these entities, assuming they do not have an "owner" or a "majority owner."[6] I must proceed upon the assumption, therefore, that the bill will have effect only against organizations or groups capable of having an "owner" or "owners." This portion of the bill would thus primarily restrict the campaign contributions of those for-profit corporations, partnerships, proprietorships, firms or other entities capable of "ownership" and sharing a common majority "owner," whether the owner is an individual or a business entity.
Second, under current Arkansas law, it is my understanding that a business entity, whether it is a corporation, proprietorship, or firm, for example, may make a contribution separate from an individual who owns that business entity. See A.C.A. § 7-6-201(14) (Supp. 2005) (defining "person" to mean "any individual, proprietorship, firm, partnership . . . corporation . . . [etc.]" and A.C.A. § 7-6-203(b)(1)(B) and (b)(2)(B) (Supp. 2005) (allowing a "person" to make a contribution up to the maximum amount to a candidate each election). See also generally, Arkansas Ethics Commission Opinion 2002-EC-008. House Bill 2384 would apparently not change this aspect of the law. Because the bill would aggregate only the contributions of the listed "business entities," an individual would presumably still be allowed to make the maximum contribution and any corporations or proprietorships in which he owns a majority interest would be allowed to make one aggregate maximum contribution. According to my reading of it, this portion of the bill restricts only the contributions of any multiple "business entities" sharing the same majority owner to one $1,000 contribution, whether the owner is an individual or another business entity.
Finally, along the same lines as discussed above, it might be stated that this "business entity" aggregation provision of House Bill 2384 operates more in a horizontal, rather than a vertical fashion with respect to the business entities at issue. For example, where one individual owns a majority interest in four different corporations, or where one corporation owns a majority interest in four different subsidiaries, the four horizontally related entities will clearly have to aggregate their contributions for purposes of the HB 2384 limit because they "shar[e] the same majority owner." The owner of the four related entities will also be able to make a contribution separate from the four entities. Where, however, one individual is the majority owner of one corporation, which corporation in turn owns a subsidiary, which subsidiary in turn owns yet another corporation, it might be argued that none of these entities is required to aggregate their contributions.[7] Each entity in this progression is owned by a distinct legal entity and might not be viewed as "sharing the same majority owner."[8] The current drafting of this "business entities" provision therefore not only fails to operate against a number of "business entities" it specifically enumerates in the definition, it also operates only on horizontally-related business entities and not vertically-related ones.
The First Amendment
It is difficult to analyze the constitutionality of this portion of the bill in light of the drafting difficulties discussed above. In this regard, it is difficult to identify the focus of the governmental concern. The governmental objective may be to broadly aggregate the contributions of all the various entities listed in the definition when they are operated by or ultimately controlled by the same persons or entities. If so, the definition of "business entities" in subsection (a) is sufficiently drafted in a broad fashion to capture all these entities, but the language of subsection (b), which refers to entities "sharing the same majority owner," simply does not accomplish its purpose as to all of the listed entities. If the governmental objective instead is only to aggregate the contributions of true for profit "business" entities, the definition of "business entities" in subsection (a) is much too broad, and the language of subsection (b) referring to a common majority owner achieves only part of this goal (leaving vertically related business entities unaffected). In light of this definitional mismatch and problems in application, I simply cannot determine the governmental objective. It is thus difficult to determine whether the Bill is "closely drawn" to achieve it.
I will set out in response to your question, however, the applicable factors weighed in the constitutional analysis and draw some conclusions based upon my understanding of the bill's applicability.
As noted by the Eighth Circuit Court of Appeals, "contribution limits `entai[l] only a marginal restriction upon the contributor's ability to engage in free communication'" and "[t]hus, a contribution limit involving even a significant interference with associational rights is nevertheless valid if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." Minnesota Concerned Citizens v. Kelley, 427 F.3d 1106 (8th Cir. 2005), citing McConnell, supra, Buckley, supra, and Beaumont, supra.
The three primary factors to discuss are whether the contribution limit involves: 1) a "significant interference" with associational rights; 2) whether there is a "sufficiently important interest" at stake; and 3) whether the applicable contribution limit is "closely drawn" to achieve it. Beaumont at 162. See also Randall v. Sorrell, supra.
Factors One and Two: Associational Rights and the State's interest in limiting them
The application of these two factors may require a slightly different analysis depending upon what type of business entity is at issue. The associational rights at issue and the governmental interest in restricting their contributions may vary with the type of entity.
Corporations-associational rights of corporations and the state's interest in limiting or restricting their contributions
To the extent House Bill 2384 limits or aggregates corporate contributions, it should be noted from the outset that under the First
Amendment, corporations may be prohibited altogether from making campaign contributions from their general corporate treasury funds. As noted in Federal Election Commission v. Beaumont, 539 U.S. 146 (2003) "Since 1907, federal law has barred corporations from contributing directly to candidates for federal office." Id. at 149.[9]
With regard to the first factor (any significant interference with corporate associational rights), the Court has stated that: "Within the realm of contributions generally, corporate contributions are furthest from the core of political expression, since corporations' First
Amendment speech and association interests are derived largely from those of their members . . . and of the public in receiving information. . . . A ban on direct corporate contributions leaves individual members of corporations free to make their own contributions, and deprives the public of little or no material information." Federal Election Commission v. Beaumont, 539 U.S. 146 (2003) at 163 (fn 8).
With regard to the second factor, the governmental interest in limiting corporate contributions, the Court in Beaumont recounted the rationale for such a ban, as follows:
"State law grants corporations special advantages-such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets — that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use `resources amassed in the economic marketplace' to obtain `an unfair advantage in the political marketplace.'"494 U.S., at 658-659 (quoting Massachusetts Citizens for Life, supra, at 257).
Id. at 154, quoting Austin v. Michigan Chamber of Commerce, 494 U.S. 652
(1990).
The Court also stated that "[S]ubstantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political `war chests' which could be used to incur political debts from legislators." Id. at 154, quoting Federal Election Comm'n v. National Right to Work Comm.,459 U.S. 197 (1982). The Court noted that the corporate ban is supported by the governmental interest in preventing corruption and the appearance of corruption. The Court also stated that the ban "restricting contributions by various organizations hedges against their use as conduits for "circumvention of [valid] contribution limits" and that "To the degree that a corporation could contribute to political candidates, the individuals `who created it, who own it, or whom it employs' [citation omitted], could exceed the bounds imposed on their own contributions by diverting money through the corporation. . . ." Id. citing, Federal Election Comm'n v. Colorado Republican Federal Campaign Comm., 533 U.S. 431 (2001); and Austin, supra.
The court in Beaumont traced the extensive history of the federal direct corporate contribution ban, starting with President Theodore Roosevelt's success in spurring the ban. Id. at 152. As a consequence, the Court stated that this "historical prologue would discourage any broadside attack on corporate campaign finance regulation or regulation of corporate contributions. . . ." Beaumont at 156.
As a constitutional matter, therefore, corporations may be prohibited altogether from making campaign contributions from their general corporate treasury funds. The associational rights of corporations are marginal in this regard and the governmental interests are sufficiently important. See also, Jacobus v. Alaska, 338 F3d 1095 (9th Cir. 2003) (upholding Alaska statute completing banning corporate soft money contributions to political parties), citing Mariani v. United States,212 F.3d 764, 773-75 (3d Cir. 2000), cert denied 531 U.S. 1010 (2000) (upholding FECA's ban on corporate contributions against First Amendment challenge); Kentucky Right to Life v. Terry, 108 F.3d 637, 645-46 (6th Cir. 1997)(same); and Athens Lumber Co. v. FEC, 718 F.2d 363 (11th Cir. 1983) (same).[10]
Non-corporate entities — associational rights and the state's interest in restricting their contributions
The remaining non-corporate business entities affected by subsection (b) of the bill may include proprietorships, firms, partnerships, joint ventures, syndicates or business trusts. I have found little case law discussing the associational rights of such entities or a state's interest in limiting their contributions. In one case, however State v. ACLU, 978 P.2d 597 (Alaska 1999), the Alaska Supreme Court, in addressing the constitutionality of an independent expenditure ban, treated these entities similarly to corporations. The court noted that the United States Supreme Court "appears to have recognized that unions and corporations are not the only organizations potentially subject to treatment different from that accorded individuals." Id. at 611, citing Federal Election Commission v. National Right to Work Committee, supra. The court noted that some of these entities, "such as limited partnerships, have many of the attributes of corporations." The court further stated that:
A general partnership or limited liability partnership has some of these attributes, if not perpetual life. These organizations, like corporations, can amass large treasuries from their business operations and the capital contributions of their investors. And controlling partners or general partners might vote to spend some of the business treasury to support or oppose state election candidates over the objections of minority or limited partners, who like corporate shareholders, have a stake in the business but no effective voice.
Id. at 611.
The court therefore concluded that the "corporate form is not determinative" and that "[r]egulation of corporate political activity . . . has reflected concern not about use of the corporate form per se, but about the potential for unfair deployment of wealth for political purposes." Id. at 611.
As a consequence, in my opinion, the state's interest in aggregating the contributions of these unincorporated entities is at least partially supported by the same rationale relating to corporations: the ability to "amass" wealth available for political purposes. In addition, the Beaumont court's concern about business entities being used as conduits for "circumvention of [valid] contribution limits" would also apply to these unincorporated entities. As stated in Beaumont, "Quite aside from war-chest corruption and the interests of contributors and owners, however, another reason for regulating corporate electoral involvement has emerged with restrictions on individual contributions, and recent cases have recognized that restricting contributions by various organizations hedges against their use as conduits for "circumvention of [valid] contribution limits." Id. at 155, citing Federal Election Comm'n v. Colorado Republican Federal Campaign Comm., 533 U.S. 431, 456, and n. 18 (2001) (which stated that "[i]ndeed, all Members of the Court agree that circumvention is a valid theory of corruption. . . .") See also, Austin, supra, at 664. Because Arkansas law allows an individual to contribute both individually and through any proprietorships, partnerships or unincorporated firms he owns, the same danger of circumvention is present with regard to these commonly-owned unincorporated entities.
The associational rights of both for profit corporations and unincorporated "for profit" business entities thus appear marginal and the state's interest in preventing corruption and the circumvention of the applicable contribution limits is sufficiently important. A restriction on business entity campaign contributions, however, must still be "closely drawn" to match the state's interest.
Is the restriction in House Bill 2384 "closely drawn?"
With regard to whether the restriction is "closely drawn," it has been stated that "A campaign contribution limitation is "closely drawn" if it focuses on the narrow aspect of political association where the actuality and potential for corruption have been identified — while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist in a limited but nonetheless substantial extent in supporting the candidates and committees with financial resources." Buckley, supra at 28. See also Montana Right to Life Association v. Eddleman, 343 F.3d 1085 (9th Cir. 2003) (stating that "After Buckley and Shrink Missouri, state campaign contribution limits . . . are "closely drawn". . . if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign").
As discussed above, it is difficult to analyze whether this portion of House Bill 2384 is "closely drawn," because I cannot determine the exact nature of the state's interest. I thus cannot determine whether the bill is "narrowly focused" on that interest. At a minimum, however, the mismatch between the definition of "business entities" in subsection (a) and the scope of the subsection (b) prohibition, as well as horizontal rather than vertical nature of the provision, create doubt as to whether this portion of the bill is "narrowly focused" or "closely drawn." It may be argued that this provision is unconstitutionally under-inclusive in not aggregating the contributions of vertically-owned businesses as well as horizontally-owned ones.
It has been stated, with regard to potentially "under-inclusive" laws, that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," McConnell v. FEC, 540 U.S. 93 at 207-08, quoting Buckley, supra, at 105 (2003). It has also been stated that "The Supreme Court has made clear . . . that Congress can act incrementally in [the area of campaign finance.]" Mariani v. United States, 212 F.3d 764, 773-75 (3d Cir. 2000) (en banc), cert denied 531 U.S. 1010 (2000). The court in Mariani, in rejecting an assertion that the federal corporate "hard money" ban was under-inclusive in light of the prevalence of "soft money," set out some applicable jurisprudence for evaluating an "under-inclusiveness" claim:
"[A] statute is not invalid under the constitution because it might have gone farther than it did.") (citations omitted). As we have explained in a case regarding solicitation of campaign funds by a candidate for judicial office, the government may "take steps, albeit tiny ones, that only partially solve a problem without totally eradicating it." Stretton v. Disciplinary Bd. of the Supreme Court of Penn., 944 F.2d 137, 146 (3d Cir.1991).
The underinclusiveness analysis employed for First Amendment questions does not change this principle. The First Amendment requires that the rule chosen must "fit" the asserted goals, City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 428, 113 S.Ct. 1505, 123 L.Ed.2d 99
(1993), and it must also strike an appropriate balance between achieving those goals and protecting constitutional rights. Underinclusiveness analysis serves to "ensure that the proffered state interest actually underlies the law," Austin, 494 U.S. at 677, 110 S.Ct. 1391 (Brennan, J., concurring). But a rule fails the test only if it cannot "fairly be said to advance any genuinely substantial governmental interest," Federal Communications Com'n v. League of Women Voters, 468 U.S. 364, 396,104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), because it provides only "ineffective or remote" support for the asserted goals, id. (citing Central Hudson Gas Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557,564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)), or "the most limited incremental" support, Bolger v. Youngs Drug Products Corp., 463 U.S. 60,73, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983).
Thus, First Amendment underinclusiveness analysis requires neither a perfect nor even the best available fit between means and ends. . . . See also Blount v. SEC, 61 F.3d 938, 946 (D.C. Cir.1995) ("[A] regulation is not fatally underinclusive simply because an alternative regulation, which would restrict more or the speech of more people could be more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals.").
This is a fairly lenient standard and it is therefore arguable whether House Bill 2384's failure to aggregate the contributions of vertically-owned business entities runs afoul of the applicable test. In my opinion, however, the failure to address the same legislative objectives with vertically-related entities may provide only "ineffective," "remote," or the "most limited incremental support" for the asserted goals.
In addition, in spite of the leniency of review, at least one decision of the United States Supreme Court has struck down a campaign finance limitation as being fatally under-inclusive. In First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978), the United States Supreme Court struck down as under-inclusive a state statute prohibiting banking associations and corporations from spending money to influence certain referendum measures. The state asserted that the prohibition "prevent[ed] the use of corporate resources in furtherance of views with which some shareholders may disagree." Id. at 792-3. The Court based its reasoning for striking the law as under-inclusive on two factors: 1) the prohibition only operated against the expenditure of money and did not prohibit other corporate activity with respect to the passage or defeat of legislation, nor did it apply until and unless a public issue became a referendum; and 2) the prohibition excluded "entities or organized groups in which numbers of persons may hold an interest or membership, and which often have resources comparable to those of large corporations." The Court stated with regard to the latter concern that ". . . the exclusion of Massachusetts business trusts, real estate investment trusts, labor unions, and other associations undermines the plausibility of the State's purported concern for the persons who happen to be shareholders in the banks and corporations covered by § 8." Id. at 793. The Court concluded that "Assuming, arguendo, that protection of shareholders is a `compelling' interest under the circumstances of this case, we find `no substantially relevant correlation between the governmental interest asserted and the State's effort to prohibit appellants from speaking." Id. at 795 quoting Shelton v. Tucker, 364 U.S., at 485.
The potential under-inclusiveness of House Bill 2384's failure to aggregate the contributions of "vertically-owned" business entities may not be as striking as the facts discussed in Bellotti. Again, it is difficult to analyze the issue without clear knowledge of the state's asserted governmental objective. I can state, however, that this potential horizontal/vertical application issue and the mismatch between the definition of "business entities" and the operative portion of the bill in this regard, create doubt as to whether the measure is "closely drawn" for purposes of the First Amendment.
Equal Protection
You have not indicated in what respect you believe this "business entity" aggregation provision may violate the Equal Protection Clause. That is, you have not indicated whether you believe this provision may deny equal protection of the law to business entities in relation to the rights of individuals or other groups that do not have an "owner," or whether it may violate equal protection in some other respect, perhaps between the horizontally-related entities and vertically-related ones. It is particularly difficult to analyze the constitutionality of this portion of the bill without a factual backdrop or specific arguments in this regard. In my opinion, however, to the extent the issue is the varying treatment of business entities as opposed to individual contributors, the classification at issue would likely survive an equal protection challenge. A more difficult question is presented with respect to the difference in treatment between horizontally and vertically-related business entities. In my opinion, depending upon the facts and proof presented, it is possible that that aspect of House Bill 2384 may be vulnerable to challenge under the Equal Protection Clause.
As a general matter, "[t]he Equal Protection Clause of the Fourteenth
Amendment commands that no State shall `deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." Cleburne v. Cleburne Living Center Inc., 473 U.S. 432, 439 (1985), citing Plyler v. Doe, 457 U.S. 202, 216 (1982). As I recently stated in Op. Att'y Gen. 2007-011:
The equal protection doctrine prohibits certain types of "classifications" that result in the disparate treatment of those who are similarly situated. Classifications in and of themselves do not violate the equal protection doctrine. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class, such as a particular racial group (see, e.g., Loving v. Virginia,388 U.S. 1 (1967)) or a fundamental right, such as the right to vote (see Dunn v. Blumstein, 405 U.S. 330 (1972)), it is necessary to show that the disparity is arbitrary. That is, the disparity must be shown to have no conceivable rational basis or rational relation to a legitimate governmental end. Fitzgerald v. Racing Assn. of Central Iowa, 539 U.S. 103
(2003); Vacco v. Quill, 521 U.S. 793 (1997); Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22 (1998); Medlock v. Leathers,311 Ark. 175, 842 S.W.2d 428 (1992), reh. denied, 1993.
As stated in Gavin v. Branstad, 122 F.3d 1081, 1089 (8th Cir. 1997), however, "Legislation that employs a suspect classification or impinges on a fundamental constitutional right merits stricter scrutiny and will survive only if it is narrowly tailored to serve a compelling governmental interest."
As one of my predecessors stated in Op. Att'y Gen. 96-100 "There are three general steps in an equal protection analysis: (1) The identification of the classification; (2) The determination of the applicable standard of review; and (3) The determination of whether that standard has been satisfied." Id at 3, citing Martz v. Reid, 865 P.2d 999
(Idaho App. 1993).
As noted above, I am uncertain, as an initial matter, to which "classification" your question refers. I assume, however, that you are concerned with the different treatment accorded majority-owned business entities, the contributions of which will be aggregated, as opposed to the treatment of individuals, or other non-business groups or entities, the contributions of which will not be aggregated.[11]
In my opinion the applicable standard for an equal protection claim in the context of a campaign contribution restriction is unclear. Although the Buckley Court addressed an equal protection challenge with regard to the $1,000 campaign limits as between incumbent candidates and challengers, the Court did not expressly set out an applicable test, stating only that: "[a]bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." Id. at 31. Other decisions have similarly found no need to set out an applicable test. See, e.g., McConnell, supra at 188 (failing to set out any applicable test, but finding no equal protection violation of FECA's restrictions on political party fundraising, stating that "Congress is fully entitled to consider the real-world differences between political parties and interest groups when crafting a system of campaign finance regulation"); California Medical Association v. FEC,453 U.S. 182 (setting out no applicable test, but finding no equal protection violation where FECA provision limited right of unincorporated associations to contribute to multi-candidate political committee, finding as a whole that such associations were treated more leniently than corporations or unions, stating that "[t]he differing restrictions placed on individuals and unincorporated associations, on the one hand, and on unions and corporations, on the other, reflect a judgment by Congress that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect the integrity of the electoral process"); Minnesota Concerned Citizens, supra (finding no equal protection violation of the rights of non-incumbents where statute imposed different contribution limits for election versus non-election years, echoing Buckley's emphasis on the absence of "invidious discrimination"); and Montana Right to Life Association v. Eddleman, supra at 1096 (stating that "[i]f the record demonstrates that the danger of corruption, or the appearance of such a danger, is greater when dealing with PAC money as opposed to other contributions, then the state's justification is constitutionally sufficient). Id., citing Austin v. Michigan Chamber of Comm., supra (prevention of corruption justification sufficient to justify differential treatment of corporations).
Other courts have grappled with whether the usual "strict scrutiny" review is applicable in such a case. See, e.g., Harwin v. Goleta Water District, 953 F.2d 488 (9th Cir. 1991), stating that:
While it is conceivably arguable that a lower level of scrutiny should apply to discriminatory contribution limits because contribution limits are subject to a lower level of scrutiny than expenditure limits, see Buckley, 424 U.S. at 20-21, 23, 96 S.Ct. at 635-36, 637, we need not decide this question today. The standard of review for contribution limits is a "rigorous" one, id. at 29, 96 S.Ct. at 640, which requires the government to "demonstrate a sufficiently important interest and employ means closely drawn to avoid unnecessary abridgment of associational freedoms.
Id. at 25, 96 S.Ct. at 638. Thus, under either strict scrutiny or the "rigorous" standard of Buckley, the Water District must show that a substantial governmental interest is served by the discrimination." See, e.g., Harwin v. Goleta Water District, 953 F.2d 488 (9th Cir. 1991) at 491.
There is thus some uncertainty as to the precise test to apply in the context of an equal protection challenge to a campaign contribution limitation. It does not appear that strict scrutiny is appropriate in light of the lesser standard of review applied to contribution restrictions by Buckley and its progeny. Although it is not expressly stated in the applicable United State Supreme Court precedent, the test is perhaps the same "closely drawn" standard applied in a First Amendment challenge to a campaign contribution limitation. See Harwin, supra. Or alternatively, the test may require a mere absence of "invidious discrimination" as discussed in Buckley, at least where the restriction is an "even-handed" one. See Minnesota Concerned Citizens, supra. Under either of these potentially applicable tests, in my opinion, the General Assembly could reasonably make a distinction, in terms of the potential for corruption and the dangers of circumvention of the applicable contribution limits, between the enumerated "business entities" sharing a common majority owner and individuals. Additionally, in my opinion, the General Assembly could also reasonably make a distinction between those business entities capable of "ownership" and other nonprofit entities and groups upon which the operative portion of the bill does not act. See California Medical Association, supra. To the extent this portion of House Bill 2384 limits corporate contributions, adequate precedent exists for the different treatment of such entities. See Beaumont, Austin, and California Medical, supra. A similar result in my opinion obtains as to the covered unincorporated entities. See State v. ACLU, supra, 978 P.2d 597
(acknowledging that unincorporated business entities are also constitutionally subject to different treatment from individuals). In my opinion, therefore, the differing treatment of business entities (incorporated or unincorporated), on the one hand, and individual contributors or non-owned entities, on the other hand, does not violate the Equal Protection Clause.
Again, you have not specified the possible classification about which you inquire. To the extent your second question might be interpreted as asking about the difference in treatment accorded business entities "sharing the same majority owner," and those business entities controlled in some way by the same person or entity, although not technically sharing the same "owner," in my opinion this portion of House Bill 2384 may be vulnerable to an equal protection challenge. Again, this portion of House Bill 2384, according to my reading of it, applies only to business entities that share the same "majority owner." The word "owner," for example, if interpreted just as it reads, may not require the aggregation of contributions of a corporation and its vertically-related subsidiaries where each subsidiary in the chain is owned by a distinct corporate entity. Although these vertically-related type entities may ultimately be controlled by a single individual or corporation, the intervening corporate form and structure may prevent them from technically being "owned" by the "same majority owner." Corporations are distinct entities from the individuals or even other corporations that own them. See, e.g., HRR Arkansas, Inc. v. River City Contractors, Inc.,350 Ark. 420, 87 S.W.3d 232 (2002) (a corporation and its stockholders are separate and distinct entities, even though a shareholder may own the majority of the stock).
The question of whether this portion of the bill violates the Equal Protection Clause depends upon the reasons for the difference in treatment. If the goals of the General Assembly are to prevent corruption or the appearance of corruption and to prevent circumvention of the applicable contribution limits, it is difficult to see how those goals would not also apply to the vertically-related entities described above. Again, the standard of review for potentially "under-inclusive" laws is fairly lenient. As with the First Amendment issue discussed above, however, in my opinion this aspect of House Bill 2384 may not be "closely drawn" to achieve the legislative objectives. As a consequence, it may be subject to an equal protection challenge.[12]
Question 3 — Does the provision of HB 2384 allowing a candidate to donate from his campaign fund to another candidate's campaign fund without allowing an officeholder who is not a candidate to donate from his holdover campaign fund violate the equal protection clause?
The applicable portion of the bill in this regard is Section 3 thereof, which proposes an amendment to A.C.A. § 7-6-203(g), which generally prohibits a candidate from taking campaign funds as "personal income." House Bill 2384 would add an additional subsection to this statute to provide that:
[(g)(4)](C)(i)[13] The use of campaign funds by a candidate to make a contribution to another candidate's campaign shall not be considered a taking of campaign funds as personal income.
(ii) A contribution made under subdivision (g)(4)(C)(i) of this section shall not exceed two hundred fifty dollars ($250) per election.
(iii) A contribution under subdivision (g)(4)(C)(i) of this section shall not count toward the campaign contribution limitations established under subsections (a) and (b) of this section.[14]
Your question is whether this provision unconstitutionally discriminates between current candidates and officeholders possessing "holdover" campaign funds, the former being allowed to use campaign funds to contribute to other candidates, and the latter not being authorized to use "holdover campaign fund[s]" for that purpose.[15] I will note that under current law, candidates and officeholders are both prohibited from using current campaign funds and "carryover funds," respectively, to make contributions to other candidates' campaigns. See Arkansas Ethics Commission "Rules on Campaign Finance and Disclosure," § 207(b) (treating "carryover funds" of officeholders in the same manner as "campaign funds" and prohibiting their use as "personal income"); and § 209 (f) (generally prohibiting the use of "campaign funds" for making contributions to another candidate's campaign because it is considered a "personal use" of the funds). House Bill 2384 would amend subsection (g) of A.C.A. § 7-6-203
to except the limited use of a candidate's campaign funds to make contributions to other candidates from the prohibition against the taking of campaign funds as "personal income," but would not make a similar exception in subsection (h)(3) of the same statute or elsewhere for campaign contributions made to candidates from the "carryover funds" of officeholders. Under House Bill 2384, the former would not generally be considered a prohibited taking of campaign funds as "personal income," but latter would apparently remain an impermissible taking of "carryover funds" as personal income.
As a preliminary matter, it is somewhat difficult to determine the standard of review applicable to this equal protection challenge. Again, as discussed at the end of my response to your second question above, the applicable test under the Equal Protection Clause for a contribution limitation is somewhat unclear. A number of cases describe the test as being a mere absence of "invidious" discrimination, but those cases apply that test to "evenhanded" restrictions. See, e.g., Buckley, supra. Your present question alleges unequal treatment of candidates and officeholders and thus does not concern an "evenhanded" restriction. In my opinion, therefore, the "invidious" discrimination test is likely inappropriate. As a consequence, the applicable equal protection test may be the same "closely drawn" standard applied to First Amendment campaign contribution limitations. See, e.g., Harwin, supra and Service Employees International Union v. Fair Political Practices, 955 F.2d 1312 (9th Cir. 1992) at n. 13 (acknowledging that it was conceivable that a level of scrutiny lower than strict scrutiny should apply to discriminatory contribution limits under the Equal Protection Clause, in light of Buckley's lesser standard for contributions, but finding it unnecessary to decide the question in that case).
I have found no pertinent case law addressing the constitutionality, on equal protection grounds, of differing treatment in the area of candidate-to-candidate or officeholder-to-candidate contributions. There are at least two cases, however, discussing the constitutionality of limitations on such transfers under the First Amendment. Because the applicable test is likely similar (the "closely drawn" analysis), these cases may be helpful in addressing the question you pose concerning equal protection.
The first case is Service Employees International Union v. Fair Political Practices, supra, from the Ninth Circuit Court of Appeals. At issue in that case, among other things, was a California citizen-initiated ban on "inter-candidate" transfers of campaign funds. The Ninth Circuit was faced with the issue of whether this ban violated the First or Fourteenth Amendments. The court treated the ban as a "contribution" limitation, and thus analyzed it under the more lenient "closely drawn" standard, rather than the strict scrutiny review required for expenditure limitations. Id. at 1322. The court struck down the inter-candidate ban, rejecting the state's several arguments in support of it. The court rejected the notion that the ban was necessary to prevent the circumvention of contribution limits by "funneling" contributions through one candidate to another, because the court had struck the applicable contribution limits as unconstitutional earlier in the same opinion. The court noted that the statute could not serve the intended purpose of preventing "funneling" in the absence of valid contribution limits. Second, the court rejected the state's assertion that the ban was necessary to prevent corruption or the appearance of corruption by "political power brokers" reasoning that "[t]he potential for corruption stems not from campaign contributions per se but from large campaign contributions" and that "[t]he inter-candidate transfer ban prohibits small contributions from one candidate to another as well as large contributions." Id. at 1323. With regard to any argument by the state that a similar intra-candidate ban prevented the misleading of contributors, by preventing funds raised by a candidate for one office from being used for another office, the court, treating this "intra-candidate" ban as an expenditure limitation subject to strict scrutiny, struck the ban, noting that "[c]oncerns about the unintended use of contributors' money can be met `by means far more narrowly tailored and less burdensome than [a] restriction on direct expenditures: simply requiring that contributors be informed that their money may be used for such a purpose.'" Id. at 1322, quoting FEC v. Massachusetts Citizens for Life, 479 U.S. 238 at 261, 93 L. Ed. 2d 539,107 S. Ct. 616 (1986). The Ninth Circuit therefore struck both the inter-candidate and intra-candidate bans under the respective "closely drawn" and strict scrutiny tests.
A different conclusion was reached by the Alaska Supreme Court several years later, in a case in which valid contribution limits were in place. In State v. ACLU, 978 P.2d 597 (Alaska 1999), at issue was an Alaska act that, among other things, prohibited campaign contributions held by a candidate from being used to make contributions to other candidates. The State argued that the ban was valid as against a First Amendment challenge because it prevented: 1) use of donations contrary to the purpose of the original contributor; 2) corrupt use of campaign funds for power-brokering; and 3) evasion of contribution limits by funneling. The state relied on an affidavit of a former state house member, which stated that: "[t]hroughout my time in the Legislature it was common knowledge that certain legislators used campaign contributions to try to secure leadership positions, particularly Speaker or President." The affiant cited a 1992 speaker's contest, claiming that Republicans threw fundraisers for Democrats to gain support for their speakership candidacies. Id. at 632. The court discussed and reviewed the Ninth Circuit's holding in Service Employees International Union, supra, but distinguished it by stating that in Alaska, valid contribution limits were in effect and thus inter-candidate transfers could lead to circumvention of those valid limits by "funneling." The court stated:
In this case, however, we have upheld the individual contribution limits. Prevention of funneling therefore remains a reasonable rationale for some restriction on inter-candidate contributions. Without restrictions, a candidate experiencing a very easy election or a candidate very successful at fundraising could pass along contributions to other candidates at will; allowing inter-candidate transfers could conceivably permit contributors to evade limits not just once but multiple times. A contributor wishing to make four $500 contributions to candidate A (three more than the [Alaska] individual limit permits) would be able to contribute to candidates B, C, and D, with the expectation that they would each pass their surplus contributions on to candidate A.
Because the State has a compelling interest in enforcing contribution limits, and because candidates still retain the right to make contributions from personal funds, we conclude that this provision is constitutional.
Id. at 633.[16]
The Alaska Supreme Court thus upheld the inter-candidate contribution ban based on "funneling" concerns. The Alaska case, however, involved aFirst Amendment challenge. Your third question raises an equal protection challenge because House Bill 2384 allows candidates to use campaign funds to make contributions to other candidates (up to $250), but does not allow officeholders with carryover funds to make similar contributions. The resolution of this issue, assuming that candidates and officeholders are "similarly situated" for purposes of the provision, is whether the difference in treatment is supported by a sufficiently significant interest and whether the distinction is "closely drawn" to effect the legislative purpose. Obviously, the court in State v. ACLU felt that the government had a "compelling public interest" in preventing circumvention of valid contribution limits, thus a total ban on inter-candidate contributions was upheld. House Bill 2384 does not impose a total ban. It allows limited candidate contributions, but does not authorize contributions from officeholder "carryover funds." The pertinent inquiry is therefore the reason for this distinction. It is difficult to analyze this point without insight into or the benefit of arguments relating to the state's asserted interest. What is the state's interest in a total ban on officeholder contributions and why does that interest not similarly apply to contributions from current candidates? What is it about current candidates that make their contributions to other candidates less objectionable than contributions from officeholders with "carryover funds?" The above discussion of the concerns regarding "funneling," "power-brokering" and misleading of contributions provide a backdrop for analyzing the issue. I am unable, however, to theorize any reason for the distinction in this regard.
Again, it is difficult to analyze the issue with a factual record or arguments as to the asserted interests at stake. I can only state that in my opinion, there may be an insufficient basis for distinguishing between current candidates and officeholders with carryover funds when it comes to inter-candidate transfers. As a consequence, this portion of House Bill 2384 may be vulnerable to an equal protection challenge.
Question 4 — Does the provision of HB 2384 allowing a candidate to donate from his campaign fund to another candidate only $250 per election set up a special class of contributors that: a) Allows a candidate to contribute $250 from his campaign account and $1,000 from his personal funds per election, thereby being allowed to contribute more than anyone else and violating the Equal Protection clause, and b) Violate the equal protection clause as it limits the campaign committee to a $250 contribution per election when other entities can contribute $1,000. Is there a compelling state interest justifying this low limit and does this low limit violate the constitutional rights of Arkansas?
Your question raises the prospect of unequal treatment between candidates making contributions from their campaign funds and other non-candidate contributors making contributions from their own funds. In my opinion, an initial and controlling question arises as to whether the candidates you mention and other contributors are "similarly situated" for purposes of equal protection analysis. Again, the Equal Protection Clause prohibits certain types of "classifications" that result in the disparate treatment of those who are "similarly situated." Cf. Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985). In my opinion, candidates possessing campaign funds are not similarly situated to individuals or entities who are not and never have been candidates. Members of the general public do not possess "campaign funds," and therefore restrictions or limitations on the use of these funds do not affect non-candidate individuals or entities. Cf. generally, Institute of Governmental Advocates et al., v. Fair Political Practices Commission,164 F.Supp.2d 1183 (E.D. Cal. 2001) (agreeing that lobbyists challenging ban on registered lobbyist political contributions were not similarly situated to other contributors); and Florida Association of Professional Lobbyists, Inc. v. Division of Legislative Information Services, 431 F.Supp2d 1128 (N.D. Fla. 2006) ("Plaintiffs cannot reasonably argue `that those who for hire attempt to influence legislation or who collect or spend funds for that purpose,' [citation omitted] are similarly situated with other citizens who petition the government.").
With regard to the last portion of your fourth question regarding the justification for the "low limit" of $250, in my opinion the governmental interests in preventing "power-brokering" and "funneling," as discussed in Service Employees International Union, supra, and State v. ACLU, supra, are sufficient to support the $250 limitation. The court acknowledged in Service Employees, supra, that large contributions have the potential for corruption or the appearance of corruption through "power brokering." The State v. ACLU case upheld a complete ban on such inter-candidate transfers in light of "funneling" concerns. In my opinion, therefore, the fact that inter-candidate transfers are limited to $250 in House Bill 2384 does not violate the Equal Protection Clause.
In my opinion, therefore, the answer to each of the subparts of your fourth question is "no."
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely, DUSTIN McDANIEL Attorney General
[1] The limit was only recently increased from $1,000 to $2,000. See Acts 2005, No. 1695. The immediately preceding $1,000 limit was adopted by virtue of Act 1839 of 2001. It replaced more stringent limits ($300 and $100 depending on the office), adopted by virtue of an initiated act adopted in 1996 and struck down in Russell v. Burris, 146 F.3d 563 (8th Cir. 1998), cert denied 525 U.S. 1001 (1998). See Init. Meas. 1996 No. 1. Prior to the 1996 initiated act, the limit was also $1,000. Id. at 565.
[2] The court stressed the marginal impact of contribution limits on free communication and the "relatively complaisant review under theFirst Amendment." Id. at 1113-1114, citing Beaumont, supra. The court held that "[f]or a sufficiently important governmental interest, the government must show that the legislature passed a contribution limit either relying upon the evidence and findings in Buckley, or had similar concerns." Id. at 1114, citing Shrink. The Eighth Circuit upheld the district court's finding that "[b]ecause the record here `demonstrates that the danger of corruption, or the appearance of such danger, is greater when dealing with PAC money as opposed to other contributions,' Minnesota's interest is constitutionally sufficient." Id. at 1115. See also, Toledo Area AFL-CIO Council v. Pizza, 898 F.Supp. 554 (N.D. Ohio 1995) (upholding an Ohio statute aggregating the contributions of PACS controlled by the same entities).
[3] The bill does treat affiliated business entities as a single entity for purposes of the $1,000 limitation, a point that will be discussed in more detail in response to your second question. In my opinion, this factor, when viewed along with the other considerations discussed above, is not sufficient to render the limits unconstitutionally low under current case law.
[4] This language appears largely borrowed from A.C.A. § 7-6-201(14) (Supp. 2005).
[5] This statute authorizes the formation of nonprofit corporations for any lawful purposes, including "professional, commercial, industrial, or trade association[s]," but requires certain entities (including labor unions), organized for "either direct or indirect financial gain" to be governed by the particular acts applicable to such associations. There are apparently no Arkansas acts addressing labor unions organized for financial gain. A review of the Arkansas Secretary of State's website reveals a number of labor unions organized as nonprofit corporations.
[6] Although it is constitutionally necessary, when adopting certain campaign expenditure limitations, to exempt certain types of non-stock, non-business related political corporations from the law (see Federal Election Commission v. Massachusetts Citizens for Life, 479 U.S. 238
(1986)), or to construe applicable definitions narrowly, so as not to include organizations whose expenditures may not be limited (see, e.g., State v. ACLU, 978 P.2d 597 (Alaska 1999)), it is apparently unnecessary to exempt such organizations from contribution restrictions. See Beaumont, supra and Federal Election Commission v. National Right to Work Committee, 459 U.S. 197 (1982). It is not necessary to discuss this point further, as your question concerns a contribution limitation and the operative portion of House Bill 2384 itself truncates its applicability to these entities.
[7] Arkansas corporations may own stock in other corporations. See A.C.A. § 4-26-204(a)(8) (Repl. 2001) and A.C.A. § 4-27-203(6) (Repl. 2001).
[8] See, e.g., HRR Arkansas, Inc. v. River City Contractors, Inc.,350 Ark. 420, 87 S.W.3d 232 (2002) (a corporation and its stockholders are separate and distinct entities, even though a shareholder may own the majority of the stock).
[9] Although as noted above, the language of the bill does not operate against nonprofit corporations, it is clear that the banning of corporate campaign contributions may also be constitutionally extended to nonprofit advocacy corporations, which were at issue in Beaumont. Id. at 157.
[10] The Court has noted, however, that the federal prohibition does not forbid the establishment, administration, and solicitation of contributions to a segregated corporate fund to be utilized for political purposes ("political action committees" or "PACS"). The Court has concluded that the restriction of corporate contributions through the sole vehicle of a PAC is not unconstitutional. Id. at 163, citing Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197 (1982).
[11] Again, these latter non-business groups and entities are within the broad definition of "business entities" under House Bill 2384, but the salient portion of the Bill, which refers to "owner[s]," does not act upon them.
[12] For a similar, but apparently broader aggregation statute, see2 U.S.C. § 441a(5) (FECA's PAC "anti-proliferation" provision) and Walther v. FEC, 468 F. Supp. 1235 (D.D.C. 1979) (discussing the scope of the federal provision).
[13] House Bill 2384, which proposed to number this new subdivision (g)(4)(C) was not adopted in the 2007 regular session. Another act,Act 221 of 2007, was adopted and it now is codified as subsection (g)(4)(C).
[14] This refers to the $1,000 campaign contribution limitation discussed earlier in response to Question 1.
[15] It is my understanding that a person holding "carryover" campaign funds may be either an officeholder (who was the successful candidate), or an unsuccessful candidate, who may retain "carryover funds" for some future campaign. See A.C.A. § 7-6-201(h)(3)(A) (Supp. 2007). "Carryover funds" are defined at A.C.A. § 7-6-201(3) (Supp. 2007) as meaning "the amount of campaign funds retained from the last election by the candidate for future use but not to exceed the annual salary, excluding expense allowances, set by Arkansas law for the office sought. . . ."
[16] The court did not base its holding on the interest in preventing "power-brokering, apparently because as in the Service Employee case, the Alaska ban prevented all inter-candidate transfer, not just large ones deemed problematic by the Third Circuit. House Bill 2384 is of course distinguishable in allowing small inter-candidate transfers but prohibiting large ones, thus leaving an asserted interest on preventing "power-brokering" viable.